UNITED STATES OF AMERICA,

– against –

ANDREW PEARSE,

Defendant.

No. 18-cr-681 (NGG)

**DEFENDANT ANDREW PEARSE'S SENTENCING MEMORANDUM**

Lisa A. Cahill
LISA CAHILL PLLC
747 Third Avenue, 32nd Floor
New York, NY  10017
(917) 690-1395
lcahill@lisacahilllaw.com

*Counsel for Defendant Andrew Pearse*

# Table of Contents

I. PRELIMINARY STATEMENT ............................................................................................ 1

II. FACTUAL BACKGROUND ........................................................................................... 5

  A. Mr. Pearse's Personal and Professional History ........................................................ 5

    1. Youth, Teen Years and Early Academic History ........................................................ 5

    2. Young Adulthood ........................................................................................................ 7

    3. The Credit Suisse Years – 2000-2013 ........................................................................ 9

    4. The Palomar Years – 2013-2019 .............................................................................. 12

  B. The Indictment, Mr. Pearse's UK Arrest and Extradition Proceedings............................ 15

  C. The Decision to Cooperate – Mr. Pearse's Waiver of Extradition, Plea Agreement  and Guilty Plea ........................................................................................................................... 16

  D. Mr. Pearse's Boustani Cooperation .............................................................................. 18

  E. Life in the UK from December 2019 to the July 2024 Chang Trial ................................. 21

    1. Personal Relationships .............................................................................................. 22

    2. Work.......................................................................................................................... 24

    3. Charitable Work ........................................................................................................ 25

  F. The July 2024 *Chang* Trial ......................................................................................... 26

  G. Mr. Pearse's Immigration Status.................................................................................... 27

  H. Additional Collateral Consequences of the Criminal Conduct........................................ 28

    1. Criminal Charges Against Mr. Pearse in Mozambique.............................................. 28

    2. Mr. Pearse is the Target of a Criminal Investigation in Switzerland ............................ 28

    3. Mr. Pearse was a Defendant in UK Civil Litigation ................................................... 29

    4. Bar from the Financial and Legal Industries ................................................................ 29

  I. Credit Suisse Settlements................................................................................................ 29

    1. U.S. Department of Justice........................................................................................ 30

    2. The Securities and Exchange Commission ................................................................ 30

III. NATURE AND CIRCUMSTANCES OF THE OFFENSE ............................................... 30

IV. THE LAW ...................................................................................................................... 32

  A. Sentencing Procedure Generally.................................................................................... 32

B.   Downward Departures Under U.S.S.G. § 5K1.1 .............................................................. 35

V. SENTENCING ANALYSIS .................................................................................................... 39

A.   A Lenient Sentence is Warranted Because of Mr. Pearse's Cooperation .......................... 39

B.   A Lenient Non-Custodial Sentence is Warranted Because Mr. Pearse May Face Severe
Collateral Consequences Otherwise, Amounting to a Penalty Far in Excess of What is
"Necessary" To Serve the Statutory Purposes of Sentencing ................................................... 42

C.   On the Record Before the Court, a Time-Served Sentence is Sufficient to Serve the
Statutory Purposes of Sentencing ........................................................................................... 45

1. Any Longer Term of Incarceration Would Not Further Specific or General Deterrence . 45

a.   Specific Deterrence and the Need to Protect the Public from Further Crimes by
Mr. Pearse……………………………………………………………………….45

b.   General Deterrence…………………………………………………………………47

2.   Incarceration is Not Necessary to Provide Rehabilitation to Mr. Pearse ...................... 48

3.   A Lenient Custodial Sentence of Time-Served Adequately Reflects the Seriousness of
the Offense, Promotes Respect for the Law and Provides Just Punishment When Coupled
with the Punishment Mr. Pearse Has Already Received ....................................................... 48

D.   A Lenient Sentence is Needed to Avoid Unwarranted Disparities .................................... 49

E.   Mr. Pearse's History and Characteristics Demonstrate That a Custodial Sentence Beyond
Time-Served is Unwarranted ................................................................................................... 50

VI. ADDITIONAL SENTENCING ISSUES ............................................................................. 51

A.   No Supervised Release Order ........................................................................................... 51

VII. CONCLUSION ................................................................................................................... 52

We respectfully submit this memorandum on behalf of Andrew Pearse, who will be sentenced by the Court on March 6, 2025. The upcoming sentencing proceeding follows Mr. Pearse's entry into a cooperation agreement with the United States government, his waiver of extradition from the United Kingdom, his July 2019 guilty plea to the charge of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and his extraordinary cooperation over nearly six years, including seven days of testimony as the government's lead witness at the 2019 *Boustani* trial and his recent testimony, again as the government's lead witness, over four days at last summer's *Chang* trial. The sentencing proceeding also follows a host of UK immigration rule changes in December 2020 that hold catastrophic collateral consequences for Mr. Pearse, a non-citizen but nearly life-long resident of the UK, should this Court impose a custodial sentence of 12 months or more, as detailed below.

For all the reasons set forth below, we respectfully request a non-incarceratory sentence of time-served.

## I.

## PRELIMINARY STATEMENT

This Court is already familiar with Mr. Pearse, having observed him testify as a government witness over four days at the *Chang* trial. What the Court heard at that trial concerned, on the one hand, the very worst choices Mr. Pearse has made in his life and, on the other, arguably the best choice he has ever made – cooperating with the government as one means of making amends for his criminality.

With this submission, we mean to share with the Court the full measure of Mr. Pearse that it did not hear at the trial – where he came from, how he strayed into criminality, what he

has lost as a result of those disastrous choices and why, most respectfully, he deserves a second chance.

We suggest most respectfully that there are compelling reasons why Mr. Pearse is deserving of leniency:

- He engaged in wrongdoing, unquestionably, but ultimately "did the right thing." His cooperation, highlighted by seven days of grueling trial testimony at the *Boustani* trial and four days at the *Chang* trial after more than 185 hours of prep sessions with the government, and disclosure to it of significant information and documents it could not have obtained otherwise, was outstanding. In large part on the basis of Mr. Pearse's disclosures, his guilty plea and his willingness to testify at any trial, the government was able also to extract a rare guilty plea from his employer, Credit Suisse Securities (Europe) Limited, and to negotiate a deferred prosecution agreement with its parent company. His cooperation contributed substantially to Credit Suisse paying over $175 million in criminal penalties to the U.S. Treasury, over $22 million in restitution, nearly $100 million to the U.S. Securities and Exchange Commission in civil money penalty, disgorgement and prejudgment interest, and approximately $200 million to the UK.

- Mr. Pearse has suffered grievously for his criminal conduct already. As a consequence of his illegal conduct and *Boustani* trial testimony, he lost all that mattered most in his life – ▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ his family home, his reputation and the respect ▇▇▇▇▇▇▇▇▇▇▇▇ the community in which he lived. He has lost his wealth and virtually all of his retirement savings, a large portion of which he obtained lawfully over 20+ years of hard work. He has no home, nor any realistic prospect of being able to afford one. In his mid-fifties as a notorious convicted felon, he has severely diminished financial prospects but a long life expectancy.

- By his scrupulous compliance with conditions of release over the last five plus years and preliminary forfeiture obligations, Mr. Pearse has demonstrated his respect for this Court and the U.S. judicial system, and a profound acceptance of responsibility for his actions and their consequences. In part on the basis of that lengthy unblemished track record on release and a non-existent criminal record other than his wire fraud conviction in this case, the Court can be confident that if he is given a second chance, he will use it to continue bettering himself and to being an honest and productive member of society, as he has already been demonstrably doing. Mr. Pearse has spent most of the last six years trying to make amends to those he has harmed and meaningfully contributing to the community through volunteer work (work that literally began in Greenpoint, Brooklyn, the day after he finished testifying in the *Boustani* trial).

At 55 years of age, able bodied, well-educated, humbled and reformed, Mr. Pearse has much he can still contribute to his family, his friends and his community. He can be a success story still.

Respectfully, there is one additional reason for leniency which looms large. Following Mr. Pearse's 2019 guilty plea, the UK tightened immigration rules to severely curtail the ability of any non-citizen with a criminal conviction to live in or potentially even visit the country. As detailed below and in the accompanying opinion of UK barrister Hafsah Masood, Mr. Pearse will be collateral damage in that effort if he receives a custodial sentence of 12 months or more. This is despite the facts that the UK has been his only home these last 45 years, he has never been charged with or convicted of any UK crime, he has paid millions of pounds in taxes to the Crown, was married for nearly 25 years to a British citizen, his three children are British citizens and he is thoroughly British in heart and soul. This is because Mr. Pearse is a citizen of New

Zealand and merely a permanent resident of the UK, with so-called "Indefinite Leave to Remain" or "ILR" status.

We ask for the Court's compassion in recognizing that a custodial sentence of 12 months or more could therefore have outsized consequences for the remainder of Mr. Pearse's life. The UK is his home, the country where his family and friends live and the only place where he has a realistic chance of being able to support himself. It is also the only country in which he would be eligible for a state pension. He has not lived in New Zealand since he was three years old. Respectfully, a sentence that would put his return in certain jeopardy would be, in the words of the Honorable Paul Oetken, considering the possible application to another defendant of a similar immigration rule in Japan, "extremely punitive and I think more punitive than is necessary . . ."

Mr. Pearse deserves to be punished for his criminal conduct – there can be no question of that. But he has already lost so much, and has spent the last six years trying to atone for his wrongs in the many ways we discuss below, above and beyond his extraordinary cooperation. We detail below, for example, the very close connection he has forged with one charitable organization in particular, a FoodCycle soup kitchen, and attach photos that say more eloquently than we ever could how far Mr. Pearse has traveled down the road toward rehabilitation. He will stand before the Court on March 6th as a changed man who we respectfully submit has earned a second chance at living a decent and meaningful life.

## II.

## **FACTUAL BACKGROUND**

A. <u>Mr. Pearse's Personal and Professional History</u>

1. *Youth, Teen Years and Early Academic History*

Mr. Pearse was born in Christchurch, New Zealand, on September 6, 1969 to John and Jill Pearse. His sister Nicola is roughly a year and a half older.

John Pearse, a New Zealand citizen of British extraction, enjoyed a solid middle class living as a mid-level employee with a meat export company in Christchurch. When Mr. Pearse was three years of age, the family moved to Tokyo, Japan, where John Pearse worked as a trader for a New Zealand company exporting meat to Japan. Home life was fairly typical of the times – Jill Pearse was a traditional homemaker and John Pearse was the bread winner. ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

In 1979, when Mr. Pearse was ten years of age, John Pearse was hired by an Australian commodity trading company and the family moved to the UK and into a middle class South London neighborhood. The UK has been Mr. Pearse's home ever since.[1]  A bright child, he

---

[1]     Mr. Pearse's parents did not secure UK citizenship for either of their children following the family's move. Nor did Mr. Pearse as an adult obtain the same since his permanent residence status secured him substantially all benefits of citizenship, including the right to vote and the right to work.

performed well on the entrance exam for UK school placement and won a spot in the initiating

year at Dulwich College, a prestigious all boys school in South London.   Mr. Pearse stayed on at

Dulwich through the American equivalents of junior high school and high school, and graduated

at 18 years of age in 1988.   As a "lifer" at Dulwich, Mr. Pearse formed deep friendships and

excelled academically and athletically.   Because sports competitions were largely held on

weekends, Mr. Pearse effectively lived at the school.   ██████████████████████████

███    Dulwich provided a joyful home for him, a place where he was well-liked, well regarded,

successful and found some measure of confidence.

[REDACTED]

2.  *Young Adulthood*

Mr. Pearse's UK equivalent of his undergraduate years were spent at Bristol University, in the southwest of the country, near Wales.  He graduated in the standard three years, close to the top of his class, with a Bachelor of Laws degree and an offer from the Lovells law firm in London.  As was typical of the time, Lovells (a so-called "Magic Circle" firm) then paid for Mr. Pearse's single year of law school, also at Bristol.

Upon graduation from law school in 1993, Mr. Pearse joined the two-year trainee program at Lovells, consisting of four six-month rotations through different departments. At the conclusion of that program, he moved to Freshfields, another Magic Circle firm which was building up its banking practice. Mr. Pearse spent a total of five years at Freshfields, three in its London office and two in its Milan office.

Mr. Pearse's time at Freshfields in London, from 1995 to 1998, coincided with the emergence globally of more exotic investment vehicles, such as asset-backed securities, and a rapidly evolving regulatory market for such instruments. A valued associate in the banking department, he enjoyed work on several complex and innovative deals for clients including the Royal Bank of Scotland and Barclays. As a young associate, Mr. Pearse was working virtually around the clock. When he wasn't working, he was spending time with a junior mergers and acquisitions lawyer at Linklaters, another Magic Circle firm. Mr. Pearse and Catherine O'Flynn married in 1996.

In 1998, the young couple had the opportunity to move to Milan, where Mr. Pearse would continue his work at Freshfields and Mrs. Pearse would join the Clifford Chance firm. What was expected to be a welcome break from the London treadmill became anything but that. Coincident with the move, Italy changed its laws to permit the issue of securitized investment products. This yielded a business boom for Freshfields but required the meticulous and challenging creation from scratch of highly complex legal templates. By then a relatively seasoned securities lawyer, Mr. Pearse was at the forefront of that effort and Freshfields and he served as counsel for the first half dozen or so securitization deals ever done in Italy.

If anything, the workload was even more arduous than it had been in London and Mr. Pearse was forced to work even through his first born's two-week stay in the ICU after a

complicated birth.  His daughter was born in May 1999.   The Milan years were very hard on the young couple, especially when their daughter was an infant, with no nearby grandparents available to lighten the load and no old friends to socialize with (indeed, Mr. Pearse's mother and sister both moved back to New Zealand in the late 1990s, and so Mr. Pearse saw them infrequently).   When the chance came to return to London, in the form of an offer from Credit Suisse, the couple jumped at it.

3.   *The Credit Suisse Years – 2000-2013*

Mr. Pearse and his young family moved back to London and into the same Dulwich neighborhood he had lived in as a young boy.   His oldest son was born in August 2000, roughly coincident with his joining Credit Suisse.   Another son was born two years later, in April 2002.

Although Mr. Pearse was hired as a lawyer and spent his first months at the Bank supporting securitization bankers, he moved to the deal team side of the business in short order.   Broadly speaking, Mr. Pearse was a product structurer.   He loved that work and was good at it.   Coverage members of deal teams, who were responsible for client relationships and not necessarily structuring experts, sought out Mr. Pearse for his experience, expertise, creativity and sophistication in dealing with clients.   By January 2003, Mr. Pearse was promoted from Vice President to Director and moved into a structured finance team focusing on esoteric products in Western Europe.   He spent three years there, with increasing management responsibilities, before moving to the Emerging Markets Group in 2006.

Mr. Pearse was elevated to Managing Director in 2007 and spent the balance of his Credit Suisse career in Emerging Markets.   Following a Group restructuring in 2011, he became one of three regional heads in the Group, in charge of business in Central Eastern Europe, Middle East and Africa, or "CEEMEA."   It was in that capacity that Mr. Pearse was first introduced by Mr.

Singh to the Mozambican Proindicus transaction and Mr. Boustani, as we discuss below. The CEEMEA team grew larger and more profitable with time; at the Group's peak, Mr. Pearse was managing roughly 25 employees.

While his career was flourishing, so too was Mr. Pearse's family life. In 2009, the family of five moved from London to the farming village of Kent, in large part so Mrs. Pearse (who had given up her legal career in 2006 to raise the three children) and her daughter could more easily engage in the horse riding they loved. As had been the case in his own school years at Dulwich, the children's weekends were consumed with sports competitions. Between them, by his estimation, Mr. Pearse and his wife never missed a single one of their children's competitions.

████████████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████████

████████████████████████████████

As for Credit Suisse, with greater seniority, responsibility and success came more political headaches. Mr. Pearse was not enjoying work as he once had, and his affair with his subordinate, Ms. Subeva, in violation of Credit Suisse policies, added other stresses and complications. In late 2012, he resigned. The then head of Emerging Markets, Chris Corson, asked him to stay until the end of June 2013 and Mr. Pearse agreed.

It was in this time period, late 2012 through June 2013, that Mr. Pearse became meaningfully involved with Proindicus S.A., a client of Credit Suisse's Emerging Markets Group and the first of the three Mozambique maritime projects at issue in the *Boustani* and *Chang* trials.[2] Mr. Pearse's involvement with Proindicus was strictly professional initially – the Bank was lending the Mozambican state-owned entity money and structuring and co-arranging additional loans. But Jean Boustani's February 2013 offer to him of a kickback triggered a colossal malfunction in Mr. Pearse's moral compass. Mr. Pearse accepted the kickback for his role in reducing a subvention fee payable from Privinvest, Mr. Boustani's employer, to Credit Suisse in connection with the Proindicus loan. Although brought up to know better, educated to

---

[2]     As the Court will recall, Proindicus was designed to be a Coast Guard-type protection and monitoring system for Mozambique's extensive Exclusive Economic Zone or "EEZ," the area within 200 miles of and along that nation's lengthy coastline. The primary purpose of Proindicus was to provide security services for a fee for rigs and other vessels involved in the production of an enormous natural gas field discovered off the northern coast of the country in 2010. Privinvest, an international ship building company, contracted to supply the various components of the system.

know better, trained as a lawyer to know better, and possessing enough accumulated wealth to have walked away, Mr. Pearse did not do so. He speaks to the "why" of that disastrous choice in his letter to the Court, attached as Exhibit A to this memorandum. Mr. Pearse will stand before the Court on March 6, 2025 precisely because he did not walk away after accepting a kickback on the subvention fee but only became more deeply involved with Mr. Boustani and Iskandar Safa (the Privinvest co-founder and owner).

From July to mid-September 2013, after the Proindicus loan closed, Mr. Pearse was on so-called "gardening leave" from Credit Suisse, *i.e.,* no longer working for the Bank and no longer going to the office but precluded from working for a competitor. During his gardening leave, Mr. Pearse was secretly working – for Privinvest's benefit and his own self-interest – on Credit Suisse upsizes to the Proindicus loan and the Bank's underwriting and offering of loan participation notes ("LPNs") for a second Mozambique maritime project, Empresa Mocambicana de Atum, S.A. ("EMATUM").[3]

In early September 2013, on conclusion of the gardening leave period, Mr. Pearse's 13 years of employment with Credit Suisse officially came to an end.

4.  *The Palomar Years – 2013-2019*

Mr. Pearse's involvement with the Proindicus project while at Credit Suisse encouraged him to believe that that business model could be replicated across coastal Africa. With a date certain for leaving the Bank, his thoughts turned to related professional opportunities. In January 2013 (weeks before Mr. Boustani offered him the kickback), he began discussions with

---

[3]     Mozambique's EEZ is also a migratory path for tuna. Years before EMATUM was formed, the Mozambique government had identified in a Fisheries Master Plan the desire, shared by other African coastal nations, to reclaim from foreign countries these natural riches in its EEZ. EMATUM was envisioned as a domestic fishing trawler fleet.

Mr. Boustani about creating a company that would ultimately become Palomar Capital Advisors, a partnership one-third owned by Mr. Pearse. Palomar was designed by him, Mr. Safa and Mr. Boustani to provide advisory services to Privinvest clients, including sovereigns, on how to raise debt from the financial markets for Proindicus-type projects. Palomar thrived in its early years, providing advisory services in connection with the EMATUM LPNs, the EMATUM sovereign bond exchange (where it was a disclosed co-advisor to the Mozambique government), and a loan from a Russian bank, VTB, to Mozambique Asset Management, or "MAM."[4]

Following his and Palomar's involvement in the Proindicus, EMATUM and MAM transactions in 2013 and 2014, Mr. Pearse's focus turned elsewhere in 2015 – to exporting the Proindicus model to other African countries with coastlines and to managing his and his Palomar partners' substantial investments in a related entity, Palomar Natural Resources ("PNR"). PNR was an oil and gas exploration company with assets in Colorado, New Mexico and Poland. Unfortunately, the market for the Proindicus-styled security system dried up as oil and gas prices collapsed between 2015 and 2016. In the meantime, PNR operating expenses continued to rise. The decision was made to sell PNR and Mr. Pearse spent the next two years trying to do so. His efforts, which included discussions with at least three serious prospective buyers, were unsuccessful, however, as adverse publicity about the Mozambique deals tainted Palomar, PNR and its partners. Mozambique was struggling to carry the debt on the projects for reasons which were the subject of detailed expert testimony at the *Boustani* trial and investor testimony at the *Chang* trial, including reduced capital gains taxes from the oil and gas sector, a downturn in

---

[4]     MAM had a dual objective business model:  (1) providing maintenance facilities for the Privinvest vessels already delivered or being delivered to Proindicus and EMATUM;  and (2) creating a shipyard to enable Mozambique to build vessels of the type supplied under the Proindicus and EMATUM loans.

prices of other commodities exported by Mozambique, *e.g.*, coal and aluminum, and depreciation in the national currency.[5]

Reporting in the Wall Street Journal in April 2016, project defaults in 2016 and 2017, the IMF's suspension of financial assistance and release of the Kroll independent audit report in June 2017 wrapped the Mozambican transactions in scandal, suspicion and controversy, dooming any realistic prospect of sale and resulting in acrimony among the PNR partners.

Mr. Pearse's 2017 and 2018 were, professionally speaking and Palomar-wise, disasters. With a cloud hanging over him and Palomar by virtue of the publicity described above, his business partnerships in tatters and no viable career alternatives, things only worsened in the summer of 2017 when the UK Financial Conduct Authority ("FCA") alerted him to the opening of a regulatory investigation related to the Mozambique projects. Although that investigation did not result in any criminal charges against Mr. Pearse in the UK, it was a distraction and an impediment to any Palomar income generation. Mr. Pearse's involvement with Palomar ultimately came to an end in July 2019 when, as part of his plea agreement with the government in this case, he forfeited his interest in it.

███████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

---

[5]      Although Mozambique initially lodged a claim in UK litigation against Mr. Pearse and others for "macro-economic losses," blaming the co-conspirators for the collapse of the Mozambican economy, it did not pursue that claim ultimately.  *See* Ex. D, ¶ 576 (Trial Judgment, UK High Court of Justice, *Mozambique v. Credit Suisse International, et al.*) (July 29, 2024).

██████████████████████████████████████████████

████████████████████████

B. <u>The Indictment, Mr. Pearse's UK Arrest and Extradition Proceedings</u>

In July 2018, the FCA advised Mr. Pearse that its investigation into him had closed. Unbeknownst to Mr. Pearse, a federal grand jury investigation in the United States was ongoing, however.   On December 19, 2018, a grand jury in this District returned a sealed indictment against him and several other individuals, charging them with a massive fraud in connection with the Mozambique projects.    Scotland Yard officers knocked on the door of the Pearse home in the early morning hours of January 4, 2019, and arrested Mr. Pearse provisionally in connection with the U.S. indictment and an imminent extradition request.

The arrest of three London-based Credit Suisse bankers in a significant U.S. fraud case was widely publicized and it was clear from the outset that the extradition proceedings would be hotly contested.   Each of the UK defendants secured prominent representation for the extradition battle, as did the U.S. government.  As the Financial Times reported in early March 2019, "the case could prove difficult for the DoJ, which has been stymied recently in other extradition cases by UK courts."  Financial Times, "UK bankers to fight extradition to US over 'tuna bond' case," Mar. 8, 2019 (Ex. E).

Respectfully, there are three important points concerning the extradition proceedings:  (1) Mr. Pearse's defenses were not frivolous and may ultimately have proved successful in opposing extradition, whether at the lower Magistrates' Courts level or on possible appeals to the High Court and Supreme Court; (2) at the very least, the extradition battle could have extended on for many months if not years;[6]  and (3) Mr. Pearse's decision to waive extradition was therefore of

---

[6]        In a section 5K1.1 motion filed in the Southern District of New York on behalf of Paul Robson, one of the Rabobank LIBOR case defendants and a British citizen, the government acknowledged that an extradition contest

great value to the U.S. Department of Justice, making him available to serve as the lead government witness at the *Boustani* and *Chang* trials, and saving government resources.

### C. The Decision to Cooperate – Mr. Pearse's Waiver of Extradition, Plea Agreement and Guilty Plea

Mr. Pearse decided in April 2019 to cooperate with the U.S. government and to waive extradition. He knew he had engaged in wrongdoing and a conversation with his teenage son convinced him there was only one right option – putting up his hand:

> I was teaching my youngest son to drive. He stopped at one point and said: Listen, dad, you told us what happened. You need to put your hand up. Because the way I brought him up was if you make a mistake, you put your hand up, you take it on the chin. And he lived by that code. . . . So I said: Yeah, okay, you're right. That's what I should do. Subsequently I agreed to cooperate with the Government, in the hope that one day he will respect me a bit more. I haven't spoken to him pretty much since that day. That was the reason I decided to cooperate. I need to set an example to my children, whose lives I just decimated and who I was now a stranger to, a second life.

July 16, 2024 Tr., 167-68 (Ex. C).

Mr. Pearse told his family that he planned to plead guilty because he was guilty. He met with federal prosecutors in London for the first time in May 2019. Over a nine-hour proffer session, he admitted to the government many facts the prosecution was already aware of and also disclosed significant facts they were not previously aware of, *e.g.*, the poolside subvention fee kickback agreement. Mr. Pearse's counsel steered the government also to the fake consulting agreement designed to conceal Privinvest's payments to Mr. Pearse in connection with the Proindicus project. Mr. Pearse met with the government in London one additional time, in June

---

"could take years" and stated that Robson's decision to waive extradition "conserved resources and was of substantial value." *United States v. Robson*, No. S4: 14-cr-00272-JSR, Gov't § 5K.1 Letter and Sentencing Memorandum, 5 & n. 4 (ECF No. 264) (S.D.N.Y. Nov. 7, 2016).

2019 and in early July, the parties finalized a cooperation agreement.[7]  One significant aspect of the agreement was that Mr. Pearse would supply the government with his Palomar e-mails, which the government had otherwise been unable to obtain (many of which were admitted into evidence in the government's case-in-chief at the *Boustani* and *Chang* trials).

While plea negotiations were ongoing, the Pearse family suffered another body blow. Mrs. Pearse, an accomplished equestrian, had a very serious riding accident, resulting in three fractures in her neck.   She was hospitalized for a week.   When allowed to return home, it was literally just to her bed, where she remained for the next several months, cared for by her husband.   The government agreed to support a pretrial release order from the Court to allow Mr. Pearse to return to the UK following his plea so that he could continue to aid in Mrs. Pearse's recovery.

On July 19, 2019, Mr. Pearse and UK counsel flew to New York, where he was taken into custody of the U.S. Marshal's Service for purposes of his arraignment and entry of a guilty plea to count one of the indictment before Judge Kuntz.   With the trial of his co-defendant, Mr. Boustani, imminent, Mr. Pearse began his cooperation with the government immediately following the guilty plea, delivering the Palomar e-mails (including a carefully curated subset of ones potentially most relevant to the *Boustani* trial) and meeting with prosecutors in person on

---

[7]     Mr. Pearse agreed in the cooperation agreement to entry of a forfeiture money judgment consisting of (a) $2.5 million cash ($1 million of which had to be paid within 45 days of the July 19, 2019 guilty plea) and (b) an amount equal to the proceeds of a mandated sale of his vineyard properties in Stellenbosch, South Africa.   Mr. Pearse paid just over $1 million within the required 45 days ($1,039,913.74 precisely).   The cooperation agreement gives him up to 30 days after sentencing to pay the judgment in full.   Should he fail to do so, the agreement requires him to consent to forfeiture of so much of his interest in HPQM, an Australian quartz mine, as necessary to satisfy the unpaid balance of the judgment.

In addition, Mr. Pearse agreed to and has forfeited his interests in various Palomar entities and the assets owned by those entities, including gas fields in Poland.  Mr. Pearse testified at the *Boustani* trial that that interest was worth between $35 and $40 million.  Oct. 16, 2019 Tr., 297 (Ex. F).

July 20, before returning home to the UK pursuant to the Court's bail order.   While in the UK, he continued his cooperation through approximately 25 hours of remote video meetings with the government, directed document searches, *etc.*   The superseding indictment returned by the grand jury on August 16, 2019 reflected in substantial part the additional information and documents supplied to the government by Mr. Pearse.

D.   <u>Mr. Pearse's Boustani Cooperation</u>

Mr. Pearse returned to New York on September 4, 2019.   He began intensive trial prep with the government immediately, commuting several days a week back and forth from his modest Greenpoint rental apartment to the U.S. Attorney's Office and also to his lawyers' midtown Manhattan offices.[8]   Over the six weeks running up to the *Boustani* trial, Mr. Pearse spent roughly 80 hours meeting with the government in preparation for his testimony.   When Mr. Pearse was not meeting with the government, he was meeting with his lawyers, with Pretrial Services, or otherwise dedicated to preparation for his testimony, *e.g.*, by reviewing case documents and sample cross-examinations.   During this time period, he also complied with stringent bail conditions, including electronic monitoring and a strict curfew.  It was an inhospitable welcome to New York City, a place Mr. Pearse had never known well, and where he had no friends, family or other support network apart from his counsel.   There were worse places Mr. Pearse could have been, obviously, *e.g.*, the MDC, and he was quite conscious throughout that he was fortunate to be released on bail at all.

---

[8]      As discussed elsewhere in this memorandum, Mr. Pearse also provided cooperation with respect to his former employer and a related entity that led to a rare guilty plea from Credit Suisse Securities (Europe) LLC, and collective criminal penalty payments to the U.S. Treasury of $175,568,000.   *See United States v. Alloni*, 18 Cr. 350 (GBD), Gov't § 5K.1 Letter, 4 (ECF No. 37) (S.D.N.Y. June 14, 2023) (noting that a guilty plea is a "relatively rare event for any corporation").

As his counsel, we were intimately involved in the preparation for Mr. Pearse's testimony at the *Boustani* trial and can attest ourselves to his intense dedication to that process and his professionalism through those demanding and at times highly stressful weeks. We were aware, of course, that Mr. Boustani had superb representation and, it seemed, infinite resources. This, of course, added considerably to the stresses and challenges of cross-examination preparation – we had to assume that every stone that could be uncovered would be and that his cross-examiner would be highly skilled. Mr. Pearse never wavered, he never buckled and he never brought less than his full attention to the preparation process (as he would also later do in his preparation for the *Chang* trial).

As discussed below and, we anticipate, in the government's section 5K1.1 motion, Mr. Pearse's trial cooperation was outstanding. He was the government's first and longest witness, the witness whose testimony the government pointed to time and again in its response to the Rule 29 motions and in summation, and who defense counsel labeled in his summation "the star witness for the prosecution." Nov. 21, 2019 Tr., 4735 (Ex. F).[9] With clarity, precision and candor, Mr. Pearse set the factual table for the government of the multiple projects, Mr. Boustani's role in their origination, planning and execution, and his co-conspirators. As the government stated in summation, Mr. Pearse "gave [the jury] a complete detailed overview of the fraudulent scheme." *Id.*, 4693 (Ex. F). In addition, the government utilized dozens of the Palomar e-mails Mr. Pearse had supplied to it as evidence in its case-in-chief against Mr. Boustani.

---

[9]     *See, e.g.*, Nov. 12, 2019 Tr., 3702-03 (Ex. F) (prosecution statement during Rule 29 argument that "[a]s to the agreement, the scheme to defraud and the intent to defraud, the Court could send this to the jury based solely on the testimony of Andrew Pearse and [Surjan] Singh . . . ."); Nov. 21, 2019 Tr., 4721 (Ex. F) (statement in government summation that "you can convict on Mr. Pearse's testimony alone. On his testimony alone, you can convict Mr. Boustani").

Mr. Pearse did so over a grueling seven full days of testimony, including approximately three full days of a skilled and thorough cross-examination by defense counsel. The government has shared with us its belief that Mr. Pearse testified truthfully and that the jury accepted his testimony as credible.

On December 2, 2019, the jury acquitted Mr. Boustani on all counts. According to press reports based on interviews of three jurors, including the foreperson, the basis for the acquittals was a perceived absence of venue. *See* Patricia Hurtado, *Bloomberg*, "Salesman Cleared in $2

Billion African Scam in Blow to U.S." (Dec. 2, 2019);  Stewart Bishop, *Law360 White Collar*, "Boustani Acquitted in $2B Mozambique Loan Fraud Case" (Dec. 2, 2019).

Because of bail restrictions, Mr. Pearse was required to remain in New York following his mid-October trial testimony and the Boustani acquittal.   He made good use of that time.   He began volunteering two days a week at the Greenpoint Reformed Church soup kitchen and food pantry in his neighborhood.   Finding welcoming arms in that church's community and its wonderfully accepting pastor, the Reverend Ann Kansfield (also the New York City Fire Department Chaplain), Mr. Pearse was soon volunteering four days a week.   He also, for the first time in his life, entered into therapy on a once-a-week basis.

E.      Life in the UK from December 2019 to the July 2024 Chang Trial

With Judge Kuntz's permission, Mr. Pearse returned to the UK just prior to Christmas 2019.   No one involved in this case could reasonably have predicted at that time that five years later, he would still be awaiting sentencing.   Although Mr. Chang was detained in South Africa by then, the notion that South Africa would extradite him to the U.S. over a competing request from Mozambique, and that Mr. Chang would actually go to trial in the U.S., seemed farfetched.

Mr. Pearse has lived under a cloud of uncertainty these last five years, in other words. ███████████████   There were numerous times when we, as his counsel, believed the time for sentencing was upon us.   Ms. Subeva was sentenced in August 2022.   But Mr. Pearse was fortunately afforded an additional opportunity to cooperate;  he is grateful for that, and even more grateful to have been released on bail these past years.   The time back home has given him the ██████████████████████████ to meaningfully make amends, to reflect on his criminal conduct, and to see what a future might look like were the Court disposed towards leniency.   At the same time, the uncertainty has understandably and meaningfully complicated

his life, in terms of finding a livelihood, a home ███████████████ as we explain below. To cite a few examples, the longest full-time employment Mr. Pearse was able to find was only 18 months approximately, at his ex-father-in-law's furniture company.   He has bounced around nearly a dozen different homes these last five years, none his own.  He has not been able to find a financial institution that will allow him to open a banking account.  Mr. Pearse's days have included great stress as a combined result of the above and we would be remiss if we did not alert the Court to this collateral impact of the case.

███████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[10]     In November 2019, Credit Suisse notified Mr. Pearse that it was forfeiting approximately $1.2 million in deferred compensation previously awarded to him.   Credit Suisse's plea agreement with the government cites its "withholding compensation for certain employees involved in the conduct" as one of the "remedial measures" taken

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ ██ ███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ █

---

by the Bank for which it deserved favorable consideration. *United States v. Credit Suisse Securities (Europe) Limited*, No. 21-cr-520 (WFK), Plea Agreement, 4 (ECF No. 11) (E.D.N.Y. Oct. 19, 2021).

[11]    As noted above, *see supra* note 7, the cooperation agreement requires Mr. Pearse to forfeit all or part of this interest if the forfeiture money judgment is not paid in full within 30 days of the sentence.

[12]    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

2. *Work*

Until the fall of 2020, unable to find white collar work because of his criminal case, notoriety, the uncertainty of how long he would be in the UK and severely restricted because of COVID in finding any other work, Mr. Pearse's days consisted primarily of volunteering, healing work with his family, self-reflection (including with the assistance of a psychiatrist for the limited time he could afford one), and conferring with his lawyers in this case and the sprawling UK civil litigation relating to the Mozambican projects.   At that time, he found steady work at his ex-father-in-law's furniture company, Long Eaton Craft & Design Company, including assisting with its website and helping develop an environmentally friendly brand of furniture.   Mr. Pearse made a modest amount – under $4,000 monthly – but gained far more than that in having a purpose and enjoying the satisfaction of a hard day's work.   That work unfortunately came to an end in February 2022, through no fault of Mr. Pearse's.

Thereafter, Mr. Pearse's only employment to speak of was occasional gardening work,

██████████████████████████████████████████████████

███████████████ Until January 2024.   That month, Mr. Pearse helped one of his few remaining friends, Mark Goldstone, establish a company called Waste Not.  Waste Not's motto is "Repurpose, Rehome, Reuse."  Mr. Pearse and a colleague drive a van which collects unwanted furniture and other household items from customers, for a minimal per-pound fee.  Waste Not then donates those items to charity retailers in and around Oxford.  Often working 12 hour days, and for minimum pay,[13] Mr. Pearse has helped the company these last 12 months become the single largest donor to Sobell House Hospice charity.   The company's success thus far, and the prospect that it may soon generate enough income to throw off salaries to Messrs. Pearse and

---

[13]      As of this filing date, Mr. Goldstone, the primary owner of the company, has paid Mr. Pearse approximately $8,100 for his Waste Not work.   Mr. Pearse has no equity stake in the company.

Goldstone, is a bright spot in his life currently.   It allows Mr. Pearse to picture a meaningful professional future, given the chance.

　　3.  *Charitable Work*

Another bright spot is Mr. Pearse's charitable work, following on the heels of his engagement in New York.   If there was a silver lining to COVID for him, it was that Mr. Pearse was able to find an excellent volunteer opportunity working for the Royal Voluntary Service as a National Health Service responder.   In that role, he committed for almost two years to be and was "on call" on a 24 hour, seven days a week, basis during which time he could be asked to help elderly citizens travel to medical appointments, go grocery shopping or simply be the friendly voice on the other end of a phone call.   He accumulated over 5,000 hours of on-call volunteering hours and over 640 hours of actual delivered assistance.   Mr. Pearse also gave occasional much needed relief to his elderly neighbor, who was caring for a husband with dementia.

In October 2022, Mr. Pearse began volunteering at a food bank in Banbury (https://banbury.foodbank.org.uk), putting in more than 200 hours of work there on Tuesdays, helping hand out to the needy basic necessities such as food tins and toiletries.  Since mid-December 2022 and continuing through to today, he volunteers approximately three-and-a-half hours most Fridays at a FoodCycle soup kitchen near Milton Keynes, a city to the north of London (https://foodcycle.org.uk/location/foodcycle-milton-keynes-wolverton/).  Volunteers serve a three-course lunch to approximately 40 to 60 needy guests.  Mr. Pearse is the kitchen project leader, managing a team of 4 to 6 cooking volunteers.   The FoodCycle website has a photograph of Mr. Pearse and fellow volunteers on its splash page and it has used his photograph

in other fundraising pitches.  Ex. H.  He has found a wonderful community there, as evident from these and other photographs.

F.     The July 2024 *Chang* Trial

On May 24, 2023, South Africa's highest court cleared the way for Mr. Chang to be extradited to New York.  *See United States v. Chang*, No. 18-cr-681 (NGG), Memorandum & Order, 4 (ECF No. 754) (E.D.N.Y. Nov. 13, 2024).  He arrived in New York in July 2023 and entered a not guilty plea at that time.  Mr. Pearse's related cooperation began immediately thereafter.   In the summer of 2023, he met with prosecutors in London for a full day. Subsequently, through his counsel, Mr. Pearse provided the government with documents obtained out of the related UK civil proceeding, which would prove central at the *Chang* trial. Specifically, GX exhibits 1927-A, 1928-1930 and the 1933 series (Privinvest's internal bribe ledgers), all admitted into evidence during the testimony of Mr. Pearse's UK counsel, documented payments made by Privinvest to various of the conspirators, including Mr. Chang. The government steered the jury to these documents repeatedly in summations (Ex. I) and wielded them in its opposition to Chang's post-trial motion for relief from the convictions.  *See United States v. Chang*, No. 18-cr-681 (NGG), Gov't Mem. of Law in Opp. to Deft's Post-Trial Motion (ECF No. 747) (E.D.N.Y. Oct. 14, 2024).

Mr. Pearse's preparation for trial testimony began in earnest in May 2024.   Between May and his July trial testimony, he spent approximately 60 hours on telephone calls or in meetings with the government preparing.  These hours were in addition to the more than 110 hours he spent with the government in preparation for the *Boustani* trial.

Mr. Pearse was the second witness called in the government's case-in-chief on July 16, 2024 (following a short records witness), and its most important, testifying over four days in

total, longer than any other witness, and setting the factual table for the jury as he had done previously at the *Boustani* trial.

Mr. Pearse left the stand on July 22 but stayed in Brooklyn until August 1, still subject to a defense trial subpoena. In its summations, the government repeatedly drew the jury back to Mr. Pearse's testimony. Ex. J. On August 8, the jury returned its verdicts, convicting Mr. Chang on both counts.

G.    <u>Mr. Pearse's Immigration Status</u>

Mr. Pearse is a citizen of New Zealand. As noted above, *see supra* note 1, he does not have dual citizenship with the UK, although it has been his home for more than 45 years, he married a British citizen and raised a family with her there, all three of his children are British citizens building their adult lives in that country, and he has paid taxes to the Crown over all his adult working life. His father and his stepmother live in the UK. His parents regrettably never applied for citizenship on his behalf when they brought him to the country at age 10 and he had no cause to do so as an adult – every significant benefit of citizenship was equally available to him given his permanent resident status.

At the time Mr. Pearse pled guilty to count one of the indictment, he could not have known that in December 2020, UK immigration rules would be amended to severely restrict the ability of a non-citizen, as he is, to return to the country following an overseas conviction, even as a mere visitor. Particularly if the non-citizen receives a custodial sentence of 12 months or more. Attached as Exhibit K to this memorandum is an opinion from a UK barrister specializing in immigration matters, Hafsah Masood, that provides exacting details of the Kafkaesque situation Mr. Pearse may find himself in depending on this Court's sentence. Because the new rules set forth devastating collateral consequences on an incarceratory sentence of 12 months or

more – *e.g.*, *Mr. Pearse would almost certainly be barred from returning to his home country, even as a visitor* – we devote a section of this submission to this issue. *See infra* V.B.

H. <u>Additional Collateral Consequences of the Criminal Conduct</u>

Candidly, one motivation behind Mr. Pearse's guilty plea was that in admitting his wrongdoing and accepting responsibility for it, including any punishment imposed by the Court, Mr. Pearse could possibly obtain closure on his past misdeeds. That notion appears naïve in hindsight, as explained below.

1. *Criminal Charges Against Mr. Pearse in Mozambique*

Although we have very little visibility into what is transpiring in Mozambique, we have learned over the last few years that (1) the Mozambican Supreme Court in October 2020 ordered Mr. Pearse, Mr. Singh and Ms. Subeva's extradition on charges of "criminal association" and "passive corruption"; (2) preliminary criminal proceedings against them are apparently underway and arrest warrants have issued against them for those charges and an embezzlement charge; and (3) Mozambique succeeded in obtaining the issuance of INTERPOL red notices against them. *See* Ex. L (Supreme Court decision, at 3, 16, 18-20, 43; Subeva arrest warrant; and confirmation of INTERPOL red notice as to Subeva). Thankfully, at least the red notice worry is gone – INTERPOL granted Mr. Pearse's request to vacate that (as it had for Mr. Boustani and Ms. Subeva) in January 2025.

3. *Mr. Pearse was a Defendant in UK Civil Litigation*

In June 2019, Mozambique sued Mr. Pearse, Ms. Subeva, Mr. Singh and various Credit Suisse and Privinvest entities and individuals in the High Court of Justice in the UK. Mozambique sought a declaration that the government's supposed guarantees on the Proindicus loan and EMATUM LPNs (signed by the then-Minister of Finance, Mr. Chang) did not constitute valid, legal or enforceable obligations, as well as unspecified damages, presumably in the hundreds of millions of dollars. Mr. Pearse was alleged to have committed the civil torts of bribery, deceit, conspiracy and dishonest assistance. Although the case settled on confidential terms in October 2023, including a dismissal as against Mr. Pearse with no liability finding, it was hotly litigated over several years and added additional stress to his life, including over the prospect of a bankruptcy filing and heated debates between his U.S. criminal and UK civil counsel over occasional conflicting priorities.

4. *Bar from the Financial and Legal Industries*

As of this writing, the FCA is in the process of moving toward a prohibition order that would prevent Mr. Pearse from being involved in any regulated financial activity. He is no longer licensed to practice law in the UK, and we understand that any attempt to recover his license would be rejected in light of the federal fraud conviction.

I.    Credit Suisse Settlements

Credit Suisse in October 2021 reached coordinated agreements with various law enforcement and regulatory bodies internationally to resolve its own culpability for the Mozambican affair, as well as its vicarious liability for Mr. Pearse, Mr. Singh and Ms. Subeva's criminality. The Bank's payments to date as a result of the U.S. criminal and regulatory cases total nearly $500 million.

We understand that the government's section 5K1.1 letter will address Mr. Pearse's substantial contribution to that result. In the meantime, we offer the below details from the U.S.[14] criminal and regulatory proceedings:

1. *U.S. Department of Justice*

Mr. Pearse's employer, Credit Suisse Securities (Europe) Limited, pled guilty to a charge of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, was sentenced on July 22, 2022 and paid a criminal fine of $500,000. The parent company, Credit Suisse Group AG, entered into a deferred prosecution agreement and paid $175,068,000 to the U.S. Treasury. The total payments of $175,568,000 to the United States are a direct product of Mr. Pearse's cooperation and guilty plea. *See, e.g., United States v. Chang*, No. 18-cr-681 (NGG), Gov't Reply in Further Supp. of *In Limine* Motion re: Credit Suisse Corporate Resolution, 4 (ECF No. 603) (E.D.N.Y. June 25, 2024) ("Credit Suisse's guilt under the law is based on *respondeat superior* liability, and whether 'through the acts of its employees and agents,' namely Pearse, Singh and Subeva, it can be held responsible."). The Credit Suisse entities also agreed on joint and several restitution liability to investors in the amount of $22,619,174. *See United States v. Credit Suisse Securities (Europe) Limited*, No. 21-cr-520 (WFK), Judgment & Memorandum & Order (ECF Nos. 21-22) (E.D.N.Y. July 22, 2022).

2. *The Securities and Exchange Commission*

Credit Suisse Group AG paid $99,051,872 to the SEC, representing the total of a civil money penalty, disgorgement amount and prejudgment interest. As we believe will be reflected in the government's section 5K.1 motion, that settlement was driven in substantial part by the SEC imputation of Mr. Pearse's knowledge – detailed over seven days of testimony at the

---

[14]    Credit Suisse paid an additional $200,664,504 in penalties on account of the UK FCA's investigation.

30

*Boustani* trial – to Credit Suisse.  *See* SEC Order, *In the Matter of Credit Suisse Group* AG, Admin. Proceeding File No. 3-20629 (Oct. 19, 2021).

### III.

### <u>NATURE AND CIRCUMSTANCES OF THE OFFENSE</u>

The Court is obviously well-familiar with Mr. Pearse's criminal conduct, having presided over the *Chang* trial and his four days' testimony there.   In brief, pursuant to a cooperation agreement with the government, Mr. Pearse pled guilty before Judge Kuntz to count one of the four-count indictment, charging him with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.   Mr. Pearse admitted his guilt at both trials.   He testified that he knew full well that various material sent to prospective investors on the Proindicus upsizes and EMATUM LPNs failed to disclose that Credit Suisse bankers were being secretly paid for their surreptitious roles in helping to arrange the various financings (including through development of business plans and compromising the due diligence process on the LPNs and Proindicus upsizes) and in connection with reduction of the subvention fee.

Mr. Pearse told the juries that it was in his self-interest to help maximize the size of the financings – Privinvest paid him a percentage of the financing obtained.   The trial records established, and Mr. Pearse admitted, receiving $45 million from Privinvest (either directly or through Palomar Holdings, Ltd.) into his UAE bank account for his efforts.  Of that $45 million, he testified to paying Mr. Singh $2 million, giving Ms. Subeva $2.2 million and investing approximately $30 million in PNR.

## IV.

## THE LAW

A. Sentencing Procedure Generally

Sentencing procedure, post-*Booker*, is by now well settled and we briefly address the familiar steps below. *United States v. Booker*, 543 U.S. 220 (2005). The overarching principle, however, is that district courts enjoy "very wide latitude" to determine an appropriately lenient sentence, whether through a departure under the U.S. Sentencing Guidelines in the case of a cooperator, as here, or by employing a variance to impose a non-Guidelines sentence should the Court deem such appropriate. *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*); *see also* U.S.S.G. § 5K1.1, comment. (backg'd). Individualized justice, the unquestioned aim of the federal criminal justice system, means the "punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (internal quotations and citation omitted).

The familiar starting point of any federal sentencing proceeding is calculation of the defendant's applicable advisory Guidelines range, *Gall v. United States*, 552 U.S. 38, 49 (2007), although a court may not presume that Guidelines range offers a reasonable and appropriate sentence. *Nelson v. United States*, 555 U.S. 350, 352 (2009); *Cavera*, 550 F.3d at 189-90. Rather, Congress requires that the district court go further, to consider the several additional sentencing factors laid out at 18 U.S.C. § 3553(a). *See United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (referring to subsection (a) as the "bedrock of all federal sentencing"). These factors, to be afforded such weight as the Court deems appropriate, are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

     (2) the need for the sentence imposed to reflect the goals of sentencing, as set forth in subsection 3553(a)(2), to wit, (a) reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment for the offense;  (b) affording adequate deterrence to criminal conduct;  (c) protecting the public from further crimes of the defendant; and (d) facilitating rehabilitation;

     (3) the kinds of sentences available;

     (4) any pertinent Sentencing Commission policy statements;

     (5) the need to avoid unwarranted sentencing disparities;  and

     (6) the need to provide restitution to any victims of the offense.

18 U.S.C. 3553(a);  *see also United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. Appx. 93 (2d Cir. 2008) ("where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences").

     There can be no doubt but that Congress in section 3553(a) intended a district court's sentencing analysis to be holistic in nature, focusing on the human being in toto as opposed to Guidelines arithmetic.  *See United States v. Smith*, 697 Fed. Appx. 31, 33 (2d Cir. 2017);  *United States v. LoCascio*, 185 Fed. Appx. 88, 90 (2d Cir. 2006).   Judge Rakoff explained the limitations of a Guidelines-centric approach in *Gupta*, 904 F. Supp. 2d at 350, 354:

     Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts, and factors.   The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense.   Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results. . . . [T]he Guidelines must take second place

> to section 3553(a), which requires a court to take account of a defendant's
> character in imposing sentence. And how could it be otherwise, for on this
> day of judgment, must one not judge the man as a whole?

*See also Kimbrough*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring) ("the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines."); *United States v. Rhodes*, No. 18 CR 887 (SHS), Sentencing Tr., 36, 41 (ECF No. 151) (S.D.N.Y. Sept. 24, 2021) (where the District Court implemented a variance from the Guidelines range because "in this case, a guidelines sentence [], to use a legal term, would be totally whack-a-doodle."); *United States v. Steven*, No. 17-cr-788 (AJN), Sentencing Tr., 18 (ECF No. 47) (S.D.N.Y. Jan. 15, 2019) (where the District Court departed downward to time-served from a 360 month range to life range and commented that "I know I have to start with the calculation. It has, obviously, no guiding value here whatsoever . . . "); *cf. United States v. Johnson*, No. 16-CR-457 (NGG), 2018 U.S. Dist. LEXIS 71257, *16 (E.D.N.Y. Apr. 27, 2018) ("Where application of the loss enhancement leads to a patently absurd sentence, it is appropriate for the court to rely more heavily on the § 3553(a) factors.") (citation omitted).

Ultimately, Congress' "overarching" command to district courts is that the sentence imposed be "sufficient, but not greater than necessary" to achieve the statutory goals of sentencing. *United States v. Collado*, No. 07 Cr. 1144 (HB), 2008 U.S. Dist. LEXIS 44010, *9 (S.D.N.Y. June 5, 2008) (referring to the so-called parsimony clause in 18 U.S.C. § 3553(a)(2)); *see also United States v. Mullings*, 131 F. Supp. 3d 1, 4 (E.D.N.Y. 2015) ("[i]n view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society and our economy, justifiable parsimony in incarceration is

prized") (citing the parsimony clause); *Adelson*, 441 F. Supp. 2d at 515 ("'necessary' is the operative word").

B. Downward Departures Under U.S.S.G. § 5K1.1

A government section 5K1.1 motion, of course, authorizes the Court to depart downward from the determined Guidelines range to whatever sentence it deems appropriate. Indeed, most respectfully, the "court has the responsibility for designing a sentence that encourages cooperation with law enforcement." *United States v. Doe*, 323 F. Supp. 3d 368, 390 (E.D.N.Y. 2018); *see also United States v. Rao*, No. 23-47 (EK), Gov't § 5K1.1 Letter, 6 (ECF No. 32) (E.D.N.Y. Dec. 24, 2024) (beseeching the court to "ensure that the ultimate sentence imposed is sufficiently lower that future defendants will be strongly incentivized to make the same worthy choice the defendant made here notwithstanding the difficulty and risks inherent in cooperation" and to "impose a sentence sufficiently lower to make the value of cooperation unmistakably clear.") (annexed at Ex. N); *United States v. Burzaco*, No. 15-cr-252 (PKC-10), Sentencing Tr., 45 (ECF No. 2016) (E.D.N.Y. July 13, 2023) ("I also find that . . . it's important, almost necessary, to impose a non-custodial sentence to incentivize other offenders to follow Mr. Burzaco's example and accept immediately the responsibility for their crimes, and to cooperate fully with the Government.") (annexed at Ex. N); *United States v. Flaum*, No. 19 CR 338 (BMC), Gov't § 5K1.1 Letter, 6 (ECF No. 26) (E.D.N.Y. Sept. 12, 2023) ("there also is a clear need in complex white-collar cases to incentivize the speedy acceptance of responsibility and cooperation that Mr. Flaum has demonstrated here."); *United States v. Trunz*, No. 19-cr-375 (WFK), Gov't § 5K1.1 Letter, 7-8 (ECF No. 25) (E.D.N.Y. June 23, 2023) (there is "a clear need in complex white-collar cases to incentivize fulsome acceptance of responsibility and cooperation.").

Respectfully, this is especially so in the case of foreign defendants who have procedural options that can be exercised to avoid U.S. convictions, including fighting extradition. *See, e.g.*, *United States v. Robson*, No. S4: 14-cr-00272-JSR, Gov't § 5K1.1 Letter and Sentencing Memorandum, 5 (ECF No. 264) (S.D.N.Y. Nov. 7, 2016) ("Given the impediments to recruiting cooperating witnesses in foreign countries, the Court should assign considerable value to Mr. Robson's decision to waive extradition . . . . Because foreign witnesses with inside knowledge of the workings of an international economic crime will weigh the Justice Department's reduced leverage overseas against the benefits of a section 5K1.1 motion, the United States respectfully urges the Court to fashion a sentence that provides an incentive for other criminally culpable foreign nationals to come forward."); *United States v. Boomgaardt*, No. 17-cr-10167-DJC, Gov't Sentencing Mem. & § 5K1.1 Motion, 16 (ECF No. 34) (D. Mass. July 24, 2018) (requesting a sentence of probation for the government's cooperating witness because "the government needs cooperating witnesses like [the defendant] to investigate and prosecute financial fraud, to ensure that those responsible for it do not go unpunished, and thereby to protect investors and the securities markets. That is particularly true of frauds, such as this one, that occur in large part overseas. Recruiting foreign cooperating witnesses can be more difficult than recruiting American cooperators, not least because criminal defendants in foreign countries have procedural options, such as contesting extradition, that can delay their prosecution for years"); *United States v. Boomgaardt*, No. 17-cr-10167-DJC, Sentencing Tr., 9-10 (ECF No. 37) (D. Mass. Aug. 3, 2018) (where the court's decision to impose a sentence of probation was based, in part, on the government's appeal: "We believe that [the defendant's] decision could, depending on his sentence, encourage cooperation by others who are similarly situated, who are similarly outside the borders of the United States, who have by virtue of that location access to

protections, procedural protections;  and we are hopeful that the [probationary] sentence that we seek in this case, if the Court decides to impose it, will encourage similar cooperation by others");  *United States v. Lewis*, No. 23-cr-370 (JGLC), Gov't Sentencing Submission, 16-17 (ECF No. 66) (S.D.N.Y. Apr. 1, 2024) (citing a voluntary surrender "in the United States rather than going through extradition" as a mitigating factor at sentencing).    In the Rabobank LIBOR case, Judge Rakoff did just that, sentencing each one of three foreign defendants who cooperated and appeared voluntarily in the United States (Paul Robson, Lee Stewart and Takayuki Yagami) to non-custodial sentences of time-served.   Judge McMahon did the same with a similarly situated British citizen sentenced in the Deutsche Bank LIBOR case, Michael Curtler.[15]   Indeed, in light of two recent Circuit reversals of LIBOR convictions, it is arguably more important today than ever that would be cooperators based in the UK see proof positive extradition waivers will be rewarded. *See United States v. Connolly*, 24 F.4[th] 821 (2d Cir. 2022);  *United States v. Allen*, 864 F.3d 63 (2d Cir. 2017).

Courts in this Circuit have regularly granted sizeable departures under section 5K1.1, including down to time-served, even in the case of defendants with substantial criminal culpability.  We have collected these cases at Exhibit N.  *See, e.g.*, *United States v. Rao*, No. 23-cr- 47 (EK), Gov't § 5K1.1 Motion & Judgment, 2 (ECF Nos. 32 & 37) (E.D.N.Y. Dec. 24, 2024 and Jan. 27, 2025) (notwithstanding Guidelines range of 151 to 188 months, and although defendant, the Chief Operating Officer of Ozy Media, pled guilty to securities fraud and wire fraud conspiracies and to aggravated identify theft, impersonating a YouTube executive in a fundraising pitch to Goldman Sachs, court sentenced him to time-served where the defendant testified at trial for six days and was a "unique source of documents," including "some of the

---

[15]      *See* ECF Nos. 269, 280, 285 (No. 14 Crim. 272 (JSR-1, 4 & 7)) (sentencing transcripts of Robson, Stewart and Yagami) & ECF No. 28 (No. 15-cr-670 (CM)) (sentencing transcript of Curtler).

most damning evidence in the case."); *United States v. Burzaco*, No. 15-cr-252 (PKC), Sentencing Tr., 7, 11, 36, 45 (ECF No. 106) (E.D.N.Y. May 12, 2023) (notwithstanding Guidelines range of 168 to 210 months and although defendant "played a central role in [soccer bribery] corruption" and "[f]or almost ten years . . . was involved in multiple fraud schemes that were massive in scope and devastating in impact," court sentenced him to time-served based in part on cooperation including testimony at two trials); *United States v. Steven*, No. 1:17-cr-00788-AJN, Gov't § 5K1.1 Motion (at 4) & Judgment (ECF Nos. 35, 42) (S.D.N.Y. Dec. 12 & 18, 2018) (notwithstanding Guidelines range of 360 months to life and although defendant pled guilty to seven charges relating to an international bribery scheme (including developing the plan to conceal the bribe payments) and initially lying to the government about a kickback made to him, court sentenced him to time-served where the defendant alerted his former employer's internal investigation team to the bribery scheme and his cooperation contributed to the employer's entry into a deferred prosecution agreement, payment of a $107 million criminal penalty and an additional $98 million to the SEC; the defendant never testified at any trial); *United States v. Marte*, No. 09 Cr. 1143 (RWS), Sentencing Opinion & Judgment, 7, 14-15, 17 (ECF Nos. 84 & 91) (S.D.N.Y. Apr. 29, 2014 and May 19, 2014) (notwithstanding Guidelines range of 412 to 485 months, and although defendant was involved for more than six years "in the large-scale, wholesale distribution of cocaine, crack and heroin," court sentenced him to time-served based in part on defendant supplying information about "several unsolved drug-related homicides," testifying at length at two trials and potentially subjecting him and his family to "some level of risk and danger"); *United States v. Miao*, No. 1:15-cr-00628-AT, Gov't § 5K1.1 Motion & Judgment (ECF Nos. 87, 90) (S.D.N.Y. July 5 & July 27, 2022) (notwithstanding Guidelines range of 292 to 365 months and although defendant occupied a leadership role in a

"widespread consumer fraud ring that defrauded cell phone customers out of over $100 million," court sentenced him to 18 months' imprisonment based on cooperation including testimony at three trials).

<h1 style="text-align:center">V.</h1>

<h2 style="text-align:center">SENTENCING ANALYSIS</h2>

The Probation Department's Guidelines calculation results in a Level 32, for an advisory custodial sentence range of 121 to 151 months.  *See* Presentence Report ("PSR"), ¶¶ 57-67.[16]  Neither party intends to object to that calculation.[17]

We understand that the government will be making a downward departure motion pursuant to USSG § 5K1.1, affording the Court discretion to depart from that advisory range.   For the reasons submitted below, we respectfully submit that time-served is an appropriate sentence for Mr. Pearse.

### A.   A Lenient Sentence is Warranted Because of Mr. Pearse's Cooperation

The Guidelines indicate that the sentencing court should give "[s]ubstantial weight" to a government's section 5K1.1 letter and we are grateful for that directive.    U.S.S.G. § 5K1.1, cmt. n. 3.  We have every confidence the government's letter will describe accurately the full extent and value of Mr. Pearse's extraordinary cooperation, which included 11 days of testimony

---

[16]        Pursuant to Your Honor's Individual Rules at section VIII, we should be filing any other objections to the PSR by today's date also.   However, Probation released the PSR only yesterday, February 11.   While we do not anticipate taking the full 14 days to object provided for under Fed. R. Crim. P. 32(f), and will move briskly, we will need some time to turn any objections around.

[17]        This is not to say that we accept the absurdity of the fraud loss Guidelines section driving the calculation with a whopping 22 level enhancement.  We do not.  As Your Honor has forcefully articulated, that particular section of the Guidelines lacks an empirical foundation, leaving it of suspect weight.  *See Johnson*, 2018 U.S. Dist. LEXIS 71257, *10-16.  Because the Court has spoken on this issue and the government's section 5K1.1 motion likewise diminishes the calculation's import in this case, we will spare Your Honor a lengthy string cite of Circuit and scholarly criticisms of the loss table.

over two trials,[18] at least 185 hours spent with the government in preparation for that testimony, and the disclosure (among other important material) of critically valuable internal bribe ledgers. The government obtained a conviction of Mr. Chang in part on the basis of Mr. Pearse's cooperation and a rare corporate felony plea from his former employer and resultant hundreds of millions of dollars paid by Credit Suisse entities to victims and the government.   The Court obviously will have its own opinion of Mr. Pearse's cooperation also and we hope that that opinion is a favorable one.

---

[18]      *See United States v. Rao*, No. 23-47 (EK), Gov't § 5K1.1 Motion, 4 (ECF No. 32) (E.D.N.Y. Dec. 24, 2024) (citing "the most difficult task of a federal cooperator:  testimony and cross-examination at a trial.") (Ex. N); *United States v. Leto*, No. 15-cr-00591-JMA, Gov't § 5K1.1 Motion, 3 (ECF No. 12) (E.D.N.Y. Oct. 12, 2021) (referring to testimony "in open court at trial" as "the most significant and useful type of assistance there is").

40

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████

Finally, we respectfully submit that crediting Mr. Pearse not only for his cooperation generally but for his extradition waiver in particular will serve an important public policy. The criminal docket in this Circuit the last several years makes abundantly clear that federal crimes are not committed by U.S. citizens exclusively but by citizens of the world. Technological advances promise that this trend will only be more pronounced in the future. *See, e.g.*, Press Release, S.D.N.Y., "U.S. Attorney Announces Extradition and Guilty Plea of Israeli Securities Trader for Participating in a Global Insider Trading Ring," June 25, 2021 ("'Today's charges represent another step in our Office's pursuit of transnational insider trading. Our Office, along with the FBI and our other law enforcement partners, will vigorously protect the integrity of our nation's capital markets, regardless of where in the world the inside information is stolen and where tips are illegally passed.'"). We respectfully suggest that crediting Mr. Pearse for this critical facet of his cooperation, when his sentence is likely to draw media attention in the UK, Switzerland and New Zealand at a minimum, is figuratively "money well spent" in terms of messaging. To quote the government's plea at the Burzaco sentencing, "the Court has an opportunity to make clear that Mr. Burzaco made the right choice." And to quote Judge Chen in response, "it is a great justice system, I think the finest in the world. And it does, I hope, and

will always reward people for doing the right thing." *United States v. Burzaco*, No. 15-cr-252
(PKC), Sentencing Tr., 31, 45 (ECF No. 106) (E.D.N.Y. May 12, 2023) (Ex. N).

    B.   <u>A Lenient Non-Custodial Sentence is Warranted Because Mr. Pearse May Face Severe
Collateral Consequences Otherwise, Amounting to a Penalty Far in Excess of What is
"Necessary" To Serve the Statutory Purposes of Sentencing</u>

    For all the reasons set forth in this submission and in the government's forthcoming

U.S.S.G. § 5K1.1 motion, we respectfully submit that a non-custodial sentence is appropriate in

this case. Moreover, there are dire collateral consequences that would follow any custodial

sentence of 12 months or more. We note that these consequences are driven largely by changes

to the UK immigration rules in December 2020, *i.e.*, Mr. Pearse could not have known of them at

the time he decided to waive extradition and plead guilty. These consequences are detailed in

Ms. Masood's affidavit, which is attached as Exhibit K to this submission.

    *First*, if he is out of the UK for two years continuously, Mr. Pearse loses his permanent

residence status in the only home he has known these last 45 years. That status *will be lost* if

any combination of sentence service time, the length of any subsequent deportation proceedings

and travel time on both ends is two years or more.

    Were that permanent residence status lost, Mr. Pearse, as a convicted felon then without

any official connection to the UK, would have extremely limited avenues for returning to his

home country, *even as a visitor*. He would have to apply for leave to return to the UK. Ms.

Masood's opinion, Ex. K, walks through various permutations. Critically, without permanent

residence status:

- Any custodial sentence of 12 months or more would *automatically* prevent Mr. Pearse

    from obtaining leave to return to the UK in any capacity (whether as a returning resident

    or a short-term visitor) unless he could convince the Secretary of State for the Home

Department ("SSHD") to grant him discretionary leave to enter based on "exceptional compelling or compassionate circumstances." Ms. Masood opines that such a grant of leave is "rare" and "very difficult" to obtain;

- In contrast, on any custodial sentence of less than 12 months, or on any non-custodial sentence such as probation, the SSHD would have the *discretion* to grant leave to return. Her consideration of such application would turn on such factors as the length of time that has passed since the offense was committed and any ties the individual has to the UK. Ms. Masood opines that in Mr. Pearse's case, "he would have a very good chance of persuading the SSHD to exercise discretion in his favour."

*Second*, even in the event a custodial sentence was short enough for Mr. Pearse hypothetically to return to the UK in under two years, *i.e.*, his permanent residence status had not lapsed, he could still expect to be denied entry to the UK at its borders if he receives a custodial sentence of 12 months or more. Under the recently enacted changes to the immigration rules, an immigration officer at a port or airport could examine Mr. Pearse on arrival in the UK and decide to keep him out of the country based on a determination that doing so would be "conducive to the public good." Ms. Masood opines that an immigration officer would be hard pressed under the relevant guidance and immigration rules to allow into the country even a permanent resident who has received a sentence of 12 months or more. Even were Mr. Pearse able to slip through the border undetected, he would be at constant risk of deportation on such a sentence.

In sum, for reasons outside this Court's control, Mr. Pearse faces a host of life-changing consequences should he be sentenced to 12 months or more in custody.

Although Mr. Pearse's mother and sister live in New Zealand and he is a New Zealand citizen, it has not been his home for 50+ years. He has no friends there and no professional

relationships, let alone professional prospects. Being stripped of his home, of his ability to be with his children in person, unable to visit for momentous occasions such as weddings and birth of grandchildren (to say nothing of more difficult times like serious illnesses), and being forced to make a new life elsewhere in his fifties, would be a more punitive sentence on Mr. Pearse than virtually any length of jail sentence.

A recent sentencing proceeding before Judge Oetken in the Southern District of New York, involving the risk of far less pernicious collateral consequences, is highly instructive in this regard. The defendant in that case, Jeffrey Wada, was not a cooperator. Indeed, he had put the government's case to the test of a trial but was convicted on a wire fraud conspiracy and substantive wire fraud counts. His lawyers urged that he be sentenced to under a year, in part because under Japanese law, he could not return to Japan ever if sentenced to a year or more. Japan was not Mr. Wada's home, not his place of citizenship (he was an American citizen), not even his birthplace. It was, however, an important place of "heritage" for him and his children, his "ancestral homeland," the country where his father was born, would probably be buried, where he still had family, and regularly visited. *United States v. Wada*, No. 18 Cr. 36 (JPO), Def't Sentencing Mem., 9, 30-31 (ECF No. 424) (S.D.N.Y. Sept. 27, 2019) (Ex. M). In significant part because of this factor, the Court adopted a variance from the 37 to 46 month Guidelines range, sentencing Wada, who was not even a cooperator, to nine months. The Court concluded that a sentence which would prevent him from returning to Japan would be "extremely punitive and I think more punitive than is necessary. . ." *United States v. Wada*, No. 18 Cr. 36 (JPO), Sentencing Tr., 30-32 (ECF No. 441) (S.D.N.Y. Oct. 21, 2019) (Ex. M).

The potential collateral consequences of a sentence of 12 months or more would, of course, be far more dire for Mr. Pearse, as explained above. Would that the UK was merely an

"ancestral homeland."  It is home to Mr. Pearse and to his children, and the best place for him to continue rebuilding a responsible life for himself and his family.  Moreover, *Mr. Pearse cooperated*.

    C.  <u>On the Record Before the Court, a Time-Served Sentence is Sufficient to Serve the Statutory Purposes of Sentencing</u>

We respectfully submit that a time-served non-custodial sentence, on the record before the Court, would be no greater than necessary to satisfy the statutory purposes of sentencing.  18 U.S.C. § 3553(a).

*1. Any Longer Term of Incarceration Would Not Further Specific or General Deterrence*

General and specific deterrence are statutory aims which every sentence must serve.   18 U.S.C. § 3553(a)(2)(B & C).   The former "is the effect a sentence has on the public's likelihood to engage in the types of activities that led to the defendant's conviction."  The latter is "the effect a sentence has on the defendant's propensity to commit further crimes of this nature." *Johnson*, 2018 U.S. Dist. LEXIS 71257, *17.

    a.  Specific Deterrence and the Need to Protect the Public from Further Crimes by Mr. Pearse

Respectfully, there is no need to protect the American public from further crimes by Mr. Pearse.  *First*, Mr. Pearse will leave the U.S immediately if sentenced to time-served or ICE will remove him following any custodial term and removal proceedings.  *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004).   *Second*, because of his conviction, notoriety and imminent loss of a regulatory license, it is highly unlikely Mr. Pearse will be in a position to commit financial crimes on the investing public again.  *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 141, 147 (2d Cir. 2009); *Johnson*, 2018 U.S. Dist. LEXIS 71257, *18-19; *Emmenegger*, 329 F. Supp. 2d at 428;  *United States v. Litvak*, No. 13 cr. 19 (JCH), Sentencing

Tr., 147 (ECF No. 298) (D. Conn. Feb. 10, 2015);  *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994).

*Third*, over his trial testimony and his letter to the Court (Ex. A), Mr. Pearse has expressed his remorse, has accepted responsibility for his criminal conduct through various penalties already paid (*e.g.*, living under a curfew for several months in New York, forfeiting in excess of $1 million in cash and his valuable interest in Polish gas fields) and demonstrated by his six years' post-arrest good conduct and cooperation that he is reformed.  *See United States v. Bradford*, 645 F.2d 115, 117 (2d Cir. 1981) ("A defendant's cooperation may, of course, be taken into consideration by a sentencing judge as a mitigating factor tending to evidence his potential for rehabilitation.").  He knows that criminal conduct, *wherever committed*, carries deserved horrific ramifications.   He has no interest in seeing history repeat itself;  he has done enough damage to his loved ones and his own future.  *See Gupta*, 904 F. Supp. 2d at 355 ("having suffered such a blow to his reputation, Mr. Gupta is unlikely to repeat his transgressions").

*Fourth*, the Court can be confident that the likelihood of Mr. Pearse recidivating is zero. He had no criminal history before this case, has had not a single brush with the law since being arrested in January 2019, has demonstrated respect for the law by adhering scrupulously to his conditions of release and preliminary forfeiture obligations, and has supportive family members to remind him regularly of all that can be lost by engaging in criminal conduct.  *See United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) ("There is a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I.  Minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism") (citations omitted).  Mr. Pearse

has also sought and obtained psychological help, and otherwise committed to self-reflection, which will likewise help him steer clear of future misconduct.

      b.   General Deterrence

This case generated massive publicity worldwide. Of particular significance, The Wall Street Journal, which is widely read in international financial circles, had a hand in breaking the story and followed the criminal case closely. *See, e.g.*, Margot Patrick & Matt Wirz, "For Love and Money in Mozambique: How a Credit Suisse Banker Helped Fuel an Alleged $2 Billion Debt Fraud," W.S.J. (Dec. 2, 2019). So did Bloomberg, obviously also widely read in the same circles. *See, e.g.*, Patricia Hurtado, "Ex-Credit Suisse Banker Says Secret Affair Helped Fuel $45 Million Fraud," Bloomberg (Oct. 17, 2019). As a result, Mr. Pearse's guilty plea, forfeitures to date, and other figurative penalties, *e.g.*, career destruction, have undoubtedly sent a message of deterrence *already* to the international financial community. *See, e.g.*, *United States v. Black*, No. 16 Cr. 370 (CM), Sentencing Tr., 90 (ECF No. 451) (S.D.N.Y. Nov. 4, 2019) ("The players in the market have witnessed their arrest, the years spent in chancery – which are not over yet – the loss of jobs and employability, the financial stress on them and their families, the loss of status in the community . . . , all collateral consequences that play into general deterrence."); *United States v. Boomgaardt*, No. 17-cr-10167-DJC, Gov't Sentencing Mem. & § 5K1.1 Motion, 17 (ECF No. 34) (D. Mass. July 24, 2018) ("[the defendant's] cooperation, and the convictions it helped secure, send a clear message to bankers and securities industry professionals in the United States and around the world: no matter how senior they are, how far away the markets in which they operate, or how complex their crimes, they cannot defraud clients with impunity, and they are not beyond the reach of the U.S. justice system.").

2. *Incarceration is Not Necessary to Provide Rehabilitation to Mr. Pearse*

The Probation Department does not indicate that incarceration is necessary to provide

Mr. Pearse with "educational or vocational training, medical care, or other correctional

treatment." 18 U.S.C. § 3553(a)(2)(D). Indeed, there is no such need.

3. *A Lenient Custodial Sentence of Time-Served Adequately Reflects the Seriousness of the Offense, Promotes Respect for the Law and Provides Just Punishment When Coupled with the Punishment Mr. Pearse Has Already Received*

In *Stewart*, 590 F.3d at 141 (2d Cir. 2009), the Second Circuit observed that "[i]t is

difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the

collateral effects of a particular sentence." *See also United States v. Vigil*, 476 F. Supp. 2d

1231, 1315 (D.N.M. 2007) ("when evaluating the justness of Vigil's punishment for the purposes

of reaching a reasonable sentence under *United States v. Booker*, it is important to consider all

other forms of punishment Vigil has already suffered"). The collateral consequences Mr. Pearse

has been and may yet be subjected to are severe indeed, constituting a "just punishment" unto

themselves. Respectfully, those consequences are punishments sufficiently reflecting the

seriousness of Mr. Pearse's crimes.

We have touched on these consequences throughout this submission. In summary, Mr.

Pearse's family collapsed, ███████████████████████████████ he has no home, he has

lost countless friends, he lost his reputation, his career, his wealth and the seeming guarantee

(after 20+ years of hard and honest work prior to his involvement with the Mozambican projects)

of a financially comfortable future. ████████████████████████████████

████████████████████████████████████████████████████████████

Mr. Pearse will never get his old life back. He has woken every day since his arrest in January

2019 with a cloud over his head and his future. These last several years he has lived with near

crippling stress about the parallel Mozambique criminal case, ████████████████ and the possible immigration consequences of this Court's sentence.

If anything, we respectfully submit that respect for the law will arguably be *promoted*, not *undermined*, by a lenient case in this case.   Such a sentence would telegraph to individuals operating in financial markets abroad that the U.S. justice system does right by those who admit their criminal culpability and strive to make amends for it.   As the government beseeched Judge Chen in connection with the Burzaco sentencing and the "promoting respect for the law" statutory sentencing goal, "[i]n sentencing Mr. Burzaco, the Government respectfully submits that the Court has an opportunity to make clear that Mr. Burzaco made the right choice.   It is a respected choice and it is a choice that other defendants can and should make in the future." *See United States v. Burzaco*, No. 15-cr-252 (PKC-10), Sentencing Tr., 31 (ECF No. 2016) (E.D.N.Y. July 13, 2023) (Ex. N).

D.  A Lenient Sentence is Needed to Avoid Unwarranted Disparities

18 U.S.C. § 3553(a)(6) provides that the Court should "avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct."   But Mr. Pearse's status as a foreign national facing deportation immediately following any prison sentence means any incarceration will be disproportionately difficult for him.  He is ineligible for designation to a minimum security prison camp (BOP Program Statement 5100.08), early release on account of First Step Act recidivism reduction programs (18 U.S.C. § 3632(d)(4)(E)) or a halfway house placement or home confinement.  He is at greater risk of having to serve his time at a substandard and potentially dangerous private prison facility.  After completion of any custodial sentence imposed by this Court, and even though he will agree to removal, he is very likely to be detained by ICE (again in notoriously substandard and potentially dangerous

facilities) while deportation proceedings occur – possibly for many months – because his offense of conviction is an "aggravated felony" for purposes of the Immigration and Nationality Act. *See* 8 U.S.C. § 1226(c)(1)(B).  Thus, any period of incarceration for Mr. Pearse would be more restrictive, more dangerous, more arduous and longer than would be the experience of an American white collar offender with an equivalent sentence.  *See United States v. Black*, No. 16 Cr. 370 (CM), Sentencing Tr., 91 (ECF No. 451) (S.D.N.Y. Nov. 4, 2019) ("because [the defendant] is a non-citizen, he will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve.   And that's not right.");  *United States v. Millul*, No. 18-cr-579 (JSR), Sentencing Tr., 26 (ECF No. 156) (S.D.N.Y. Aug. 27, 2019) (lower sentence imposed in light of "the ICE problem and the camp problem");  *United States v. Hussain*, Cr. No. 16-00462 (CRB), Sentencing Tr., 15, 51 (ECF No. 562) (N.D. Cal. May 14, 2019) (varying downward from the Guidelines range over the government's objection:  "I accept as a fundamental proposition, I should try to avoid disparities.   But where he is going to be confined is disparate, it's different, and it's different by virtue of the fact that he's not an American citizen or resident of the United States. . . . [A]bsent a reason that I accept, I think that that is an appropriate vehicle for use of a variance";  "The justification in the Court's mind is that had you been what we call a run-of-the mill white-collar offender, it is clear, in the Court's mind, that you would be sentenced to a low-security facility, such as a camp").

E.   Mr. Pearse's History and Characteristics Demonstrate That a Custodial Sentence Beyond Time-Served is Unwarranted

Not for nothing is a defendant's "history and characteristics" the first of the section 3553(a) factors.  If we have saved this discussion for last, it is only because, really, the whole point of this submission has been to give the Court a sense of who Mr. Pearse actually is at his core *today*, beyond the polished witness the Court saw at the *Chang* trial and beyond the wealthy

investment banker he once was.  Of course this Court will weigh very carefully Mr. Pearse's character alongside its consideration of his criminal conduct in arriving at a fair and just sentence.

The Southern District's Judge Nathan put the heart of the matter beautifully in a sentencing proceeding:   "All of us are more than the wors[t] thing we've ever done . . ."  *United States v. Steven*, No. 1:17-cr-00788-AJN, Sentencing Tr., 35 (ECF No. 47) (S.D.N.Y. Jan. 15, 2019).  So too with Mr. Pearse.

Mr. Pearse has lost many friends since his arrest.   We submit that those who remain are loyal because they know him best and appreciate who he is at his core.   Letters from these friends, two new friends he made in New York, his UK lawyer, his sister and ex-wife, attached as Exhibit B to this submission, speak to his fundamental decency and the road he has been on these last several years.   We know the Court will read those letters closely and so do not paraphrase or quote from them here.   They speak for themselves as regards Mr. Pearse's character.

## VI.

## ADDITIONAL SENTENCING ISSUES

A. No Supervised Release Order

Pursuant to U.S.S.G. § 5D1.1(c), and as the Court noted at Mr. Chang's sentencing, a term of supervised release need not be imposed because it is not required by statute and Mr. Pearse is a deportable alien.  *See also United States v. Steven*, 1:17-cr-00788-AJN, Sentencing Tr., 39 (ECF No. 47) (S.D.N.Y. Jan. 15, 2019) (declining to impose a supervised release term on a British citizen who was a resident of the UAE

where "[t]he policy statement in the guidelines is not to impose supervised release for non-residents").

**VII.**

**<u>CONCLUSION</u>**

The United States Supreme Court has observed that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). We know the Court takes this tradition seriously.

Mr. Pearse, like most of us, is deeply flawed. He has done some terrible things in his life, including cheating on his wife and allowing greed to so blind him that he got involved with individuals he knew to be dangerous. The ramifications of his misdeeds are enormous; innocents have been harmed, including his children and American investors.

But the man who will stand before the Court on March 6th is not the same Andrew Pearse who engaged in these misdeeds. This Andrew Pearse is a better man. All he wants is a second chance to live a decent and honest life. For all the reasons articulated above, we respectfully submit that he has earned that.

Dated: New York, New York
February 12, 2025

LISA CAHILL PLLC

By: _____
Lisa A. Cahill
747 Third Avenue, 32nd Floor
New York, NY 10017
lcahill@lisacahilllaw.com
(917) 690-1395

*Attorney for Defendant Andrew Pearse*