# EXHIBIT K

<strong><u>RE: MR ANDREW PEARSE</u></strong>

<strong><u>OPINION</u></strong>

## A. Summary of opinion

1. Mr Andrew Pearse is a citizen of New Zealand, with indefinite leave to remain in the United Kingdom ("UK"). "Indefinite leave to remain" – also known as "ILR" – is a form of settled status with considerable benefits and privileges, which include the right to live in the UK indefinitely, and the right to work and to access free healthcare and other state benefits.

2. I have been asked to provide an opinion on the risk to Mr Pearse's status and future in the UK as a result of the criminal proceedings currently pending in the Eastern District of New York and, in particular, the consequences of a lengthy custodial sentence.

3. In summary, the position is as follows:

   (1) In the last decade or so under the Conservative government, there has been a significant tightening of immigration laws and the introduction of robust measures aimed at foreign nationals.

   (2) Consistently with this trend, on 1 December 2020, the Immigration Rules were amended to introduce a more robust framework against which new immigration applications are to be assessed, or a person's existing leave to reside in the UK cancelled[1], including stringent provisions aimed at foreign nationals who commit crimes, whether committing them in the UK or overseas. Significantly, the Immigration Rules now provide that a person's leave to reside in the UK *must* be cancelled, or an application for their re-entry into the UK refused, if they have received a custodial sentence of 12+ months, or more, for a criminal conviction, whether that conviction is recorded in the UK, or overseas. The position before 1 December 2020 (and, therefore, at the time of the events described at paras 5 and 6 below), was much less stringent: then an application for re-entry into the UK would

---

[1] This account is taken from the Home Office's guidance document: *Suitability: non-conducive grounds for refusal or cancellation of entry clearance or permission* (16 January 2024) which explains that: '*On 1 December 2020, the Immigration Rules were amended to introduce a more robust and consistent framework against which immigration applications are assessed or permission cancelled on suitability grounds*.' <u>Suitability: non-conducive grounds caseworker guidance (publishing.service.gov.uk)</u>

only be refused on mandatory grounds if that person had received a custodial sentence of 4 years or more, or they had received a custodial sentence of between 12 months and 4 years within the preceding 10 years.[2]

(3) Moreover, since November 2021, Government policy has been to pursue deportation action where a person has received a custodial sentence of 12+ months for a conviction recorded in the UK or overseas.[3]

(4) A custodial sentence of 12+ months would therefore have very serious consequences for Mr Pearse. If Mr Pearse were to receive a custodial sentence of 12+ months, his ILR would almost certainly be cancelled at the border when he sought re-entry to the UK. Alternatively, if he managed to enter the UK then there is a high chance he would be deported. He would not then be able to re-enter the UK even as a visitor. These serious consequences are addressed in more detail below.

## B. Introduction

4. Mr Pearse (date of birth, 6 September 1969) is a citizen of New Zealand, with indefinite leave to remain in the UK. Mr Pearse has lived in the UK since 1979, and therefore almost all his life. Though he is recently divorced I am told he has a civil relationship with his former wife and at least two of his three adult children, all of whom are British citizens and live in the UK.

5. Mr Pearse was a senior banker at Credit Suisse and became embroiled in the so-called "tuna bond" scandal. The following fraud charges were brought against him by the US Department of Justice: (1) conspiracy to commit wire fraud in violation of 18 U.S.C, s.1349, (2) conspiracy to commit securities fraud in violation of 18 U.S.C, s.371, (3) conspiracy to violate the Foreign Corrupt Practices Act anti bribery and internal controls provisions in violation of 18 U.S.C s.371, and (4) conspiracy to commit money laundering in violation of 18 U.S.C s.1956(h).

---

[2] See Para 320(2) of Part 9 of the Immigration Rules in force before 1 November 2020, which can be accessed at: Immigration_Rules_-_Archive_05-10-2020.pdf (publishing.service.gov.uk)
[3] This is the Government's publicly stated position: see Home Office guidance document, *Conducive deportation* (15 March 2024), p11. Conducive Deportation (publishing.service.gov.uk)

6. On 19 July 2019 Mr Pearse pleaded guilty to count 1 in exchange for his co-operation with the US authorities in future criminal proceedings brought against other actors.

7. Mr Pearse is currently on bail in the UK and will be returning to the US for sentencing. I am told that despite his co-operation, Mr Pearse remains at risk of a custodial sentence.

8. I am asked to address the following questions:
   (1) Can ILR be lost/taken away and, if so, how?
   (2) Would a custodial sentence jeopardise Mr Pearse's ILR status and his future in the UK?

9. My opinion is structured as follows. I will begin by providing an overview of what ILR is and how it can be lost or taken away (section C), followed by the legal and policy framework (section D). I will then address the circumstances in which an immigration officer can cancel a person's ILR when they present at the border, following arrival in the UK, and the implications of: (i) Mr Pearse receiving a custodial sentence of 12+ months, and (ii) Mr Pearse receiving a non-custodial sentence or a custodial sentence of less than 12 months (section E). I will then address the power of the Secretary of State for the Home Department to make exclusion decisions in respect of someone outside the UK (section F), provide an account and likelihood of deportation action being taken against Mr Pearse (section G) and, finally, address the implications if Mr Pearse's ILR lapses as a result of continued absence from the UK (section H).

10. A copy of my CV is at Annex B. I was called to the Bar in 2006 and am a practising barrister specialising in immigration law. As a member of the Attorney General's A Panel of Counsel to the Crown, I regularly advise and represent the Home Office in the most complex cases in the field of immigration and human rights. I also have considerable experience of acting for individuals, including in cases involving criminality and deportation.

## C. What is ILR and how it can be lost

11. ILR means there is no restriction on the period for which a person can remain in the UK. Limited leave, on the other hand, will be time-limited, and will have to be renewed on expiry. ILR is therefore a form of settled status, and highly valuable. It comes with

considerable benefits and privileges, including the right to live in the UK indefinitely, as well as the right to work and study in the UK, and to access free healthcare and other state benefits.

12. ILR can be lost or taken away. In summary, and in so far as relevant:

(1) ILR can be cancelled while a person is outside the UK or at the border when they seek entry to the UK, if cancellation would be '*conducive to the public good*.' As explained below, this will almost certainly be the outcome if they have received a custodial sentence of 12+ months for a conviction, whether in the UK or overseas.

(2) In the case of a person in the UK, their ILR will be invalidated if a deportation order is made against them.

(3) ILR can also lapse. If a person is absent from the UK for a continuous period of more than 2 years, their ILR will lapse automatically. So, if Mr Pearse was sentenced to a period of imprisonment of 2+ years and were to serve the whole of his sentence outside the UK, his ILR would lapse automatically because of his absence from the UK. If, having lost his status, Mr Pearse then wished to return to and resume his life in the UK as a resident, he would have to make an application for entry clearance. Such an application would almost certainly be refused on the basis that he had received a custodial sentence of 12+ months. This too is addressed below.

**D. Overview of legal and policy framework**

13. The following will assist with understanding my opinion below:

(1) The regime for immigration control in the UK broadly consists of: (i) primary and secondary legislation, (ii) the Immigration Rules,[4] and (ii) guidance documents.

(2) The Immigration Rules, which are amended from time to time, contain a detailed code including the requirements for leave to enter and remain in the UK, and the grounds for refusal and cancellation of leave. The Home Secretary, formally known

---

[4] The Immigration Rules are a statement of the SSHD's administrative practice on immigration. Immigration Rules - Guidance - GOV.UK (www.gov.uk). The Immigration Rules are not a statute but are laid before Parliament.

as the Secretary of State for the Home Department ("SSHD"),[5] has the power to act outside the Immigration Rules, for example, by granting a person leave although they do not meet the requirements of the Rules, or not cancelling a person's leave even though this is required by the Rules. In some cases, the SSHD may even be obliged to do so because by following the Rules she would be acting in breach of a person's rights under European Convention on Human Rights ("Convention rights" or "human rights"), which includes the right to respect for private and family life.[6] That said, in my experience, there is usually limited scope for successful reliance on human rights in cases involving criminality and it is otherwise very difficult to persuade the SSHD to act outside the Immigration Rules. I will address this in more detail below.

(3) The Home Office also publishes guidance documents which are updated from time to time. These typically set out how officials should apply the Immigration Rules, and the circumstances in which the SSHD or her officials may, in the exercise of her discretion, act outside the Immigration Rules. Although the guidance documents do not have statutory force, the SSHD is required to follow her published guidance as a matter of public law. There are several guidance documents which are of relevance to this case. I will refer to these as necessary below.

14. I have set out the relevant provisions of the Immigration Rules and relevant legislation in Annex A to this advice.

## E. Cancellation of ILR at the border

Power to cancel leave and the grounds for cancellation of leave

15. All persons arriving at UK ports of entry (international airports, seaports and the Channel Tunnel), other than those arriving from the Republic of Ireland, are checked through passport control by immigration officers and must produce passports or identity documents which establish their identity and nationality. Those who are British citizens or have the right of abode in the UK are admitted automatically. Foreign nationals will in all likelihood be examined for the purpose of determining whether they have leave

---

[5] The SSHD is the government minister who heads the Home Office, which is the government department with responsibility for immigration and border control. Decisions in individual cases are generally taken by Home Office officials and not the SSHD personally.
[6] The Human Rights Act 1998 provides that '*It is unlawful for a public authority to act in a way which is incompatible with a Convention right*' (s.6).

to enter the UK. Even those who have leave, like Mr Pearse, can be examined by an immigration officer '*for the purpose of determining whether it would be conducive to the public good for that leave to be cancelled.*'[7] On the completion of this examination the immigration officer has the power to cancel a person's leave, including ILR.[8]

16. Since 1 December 2020, Part 9 of the Immigration Rules contains provisions which set out how this power to cancel leave should be exercised. The relevant provisions, which I will refer to as "the grounds for cancellation", are as follows:

Mandatory grounds for cancellation

'*9.3.2. Entry clearance or permission[*[9]*] held by a person <u>must be cancelled</u> where the person's presence in the UK is not conducive to the public good.*
*...*
*9.4.2. Entry clearance or permission held by a person <u>must be cancelled</u> where the person:*
 *(a) has been convicted of a criminal offence in the UK or overseas for which they have received <u>a custodial sentence of 12 months or more</u>; or*
 *(b) is a <u>persistent offender</u> who shows a particular disregard for the law; or*
 *(c) has committed a criminal offence, or offences, which <u>caused serious harm</u>.*'

Discretionary grounds for cancellation

'*9.4.5. Entry clearance or permission held by a person <u>may be cancelled</u> ... where the person:*

 *(a) has been convicted of a criminal offence in the UK or overseas for which they have received <u>a custodial sentence of less than 12 months</u>; or*

 *(b) has been convicted of a criminal offence in the UK or overseas for which they have received <u>a non-custodial sentence, or received an out-of-court disposal</u> that is recorded on their criminal record.*'

17. Home Office guidance, *Suitability: non-conducive grounds for refusal or cancellation of entry clearance or permission* (16 January 2024), provides that immigration officers assessing whether cancellation would be conducive to the public good '*must consider*' whether these grounds for cancellation apply (page 12). The guidance goes on to state:

---

[7] Para 2A(3) of Schedule 2 to the Immigration Act 1971.
[8] Para 2A(8) of Schedule 2 to the Immigration Act 1971, read with Article 13(5) of the Immigration (Leave to Enter) Order 2000. In *R (C1) v SSHD* [2022] EWCA Civ 30, the Secretary of State for the Home Department is recorded, at para 42 of the judgment, as having taken the position that non-lapsing leave could be brought to an end when the person returned to the UK (article 13(5)) as well as when the person was outside the UK (article 13(7)), and this is not confined to leave to limited leave to remain, but extends to ILR.
[9] "Permission" includes indefinite leave to enter or remain (see para 6.2 of the Immigration Rules, read with the Immigration Act 1971)

'*You must only cancel leave at the border on the above grounds if you are satisfied that the circumstances are such that it would be conducive to the public good for that leave to be cancelled*.'

18. Although, as this makes clear, the ultimate question will be whether it is conducive to the public good for a person's leave to be cancelled, an immigration officer is *required* to consider whether any of the grounds for cancellation apply, and a number of these grounds are *mandatory* in nature, e.g. leave *must* be cancelled if a person has been convicted of a criminal offence for which they have received a custodial sentence of 12 months or more. It follows, in my view, that an immigration officer will almost certainly decide that it is conducive to the public good for a person's leave to be cancelled and will therefore cancel leave where a mandatory ground for cancellation applies, e.g. a person has a conviction in the UK or overseas for which he has received a custodial sentence of 12+ months.

19. Below I will address this in more detail. Before I do so, it should be noted that, for the purposes of Part 9 of the Immigration Rules, a "custodial sentence" is a sentence of imprisonment/incarceration. I am told that, given the nature of the charge to which Mr Pearse pled guilty, the judge has the option of requiring Mr Pearse, in lieu of incarceration, to stay in a home (potentially subject to location monitoring) or a community as part of a sentence of probation.   I am also told that a sentence of probation is *distinct* from a sentence of incarceration under the U.S. statutory code. I refer to Home Office guidance, *Grounds for refusal – Criminality* (16 January 2024) which, under the heading '*Overseas convictions and offences not recognised in the UK*', states as follows:

    *'The rules [i.e. Immigration Rules] apply equally to overseas convictions and these should be considered in the same way as the broad equivalent in the UK context, even where there may be no direct match.*
    *An example of where there is no direct match would be a New Zealand "home detention order." This is a non-custodial sentence and similar to UK civil orders.'*

20. This suggests that an order of home or community detention, which is distinct from a sentence of incarceration under the U.S. statutory code, would be considered a non-custodial sentence for the purposes of Part 9. But it is important to note that there is no case law on this point, only the guidance I refer to above.

21. Para 9.4.2(a) of the Immigration Rules provides that a person's leave *must* be cancelled if they have been convicted of a criminal offence in the UK or overseas for which they have received a custodial sentence of 12 months or more.

22. It follows that if Mr Pearse receives a custodial sentence of 12 months or more, his ILR will be cancelled by an immigration officer if and when Mr Pearse presented himself at the border *unless* Mr Pearse could demonstrate and the immigration officer was satisfied, that the cancellation of ILR would breach his human rights or there were '*exceptional compelling or compassionate circumstances*' meaning his leave should not be cancelled[10].

23. Despite Mr Pearse's long residence in the UK, in my view, it would be very difficult to persuade an immigration officer that cancellation would be a breach of Mr Pearse's human rights (most relevantly, Mr Pearse's right to respect for family or private life) particularly given Mr Pearse's conviction, the length of his custodial sentence (which, on this hypothesis, would be 12+ months), the terms of para 9.4.2(a) (which would be treated as a statement of the SSHD's policy to which weight would be attached), and his personal circumstances (his children are adults and he is not married, or in a stable/long-term relationship). The right to respect for family and private life is a *qualified* right which requires a balance to be struck between an individual's interests on the one hand and the public interest on the other. In carrying out the balancing exercise, criminality – *especially* in a case where a person has received a custodial sentence of 12+ months – will be treated as a weighty public interest factor.

24. Alternatively, Mr Pearse would have to demonstrate '*exceptional compelling or compassionate circumstances*.' Although this may seem like a straightforward test to satisfy, experience demonstrates that it is not. If Mr Pearse cannot show that the cancellation of his leave would breach his human rights, the chances of succeeding on

---

[10] The Home Office guidance, *Suitability: refusal of entry on arrival in the United Kingdom and cancellation of extant entry clearance or permission* (1 June 2023) states, that:
'*Whether refusal or cancellation is mandatory or discretionary you must always consider the following exceptions*' which (so far as relevant) include '*whether the decision to refuse or cancel would breach a person's Convention rights under the Human Rights Act 1998*' or '*whether there are any exceptional compelling or compassionate circumstances ....*' Suitability Section 3 of Part 9.docx (publishing.service.gov.uk)

the basis that there are exceptional compelling or compassionate circumstances is, in my view, remote.[11]

25. The reality is that if Mr Pearse receives a custodial sentence of 12+ months, his ILR would almost certainly be cancelled if and when he seeks to return to the UK and presents himself to an immigration officer at the border.

26. Finally, there is generally no right of appeal against the decision of an immigration officer to cancel leave, meaning the decision could only be challenged on judicial review. A right of appeal to a tribunal would only arise if the decision involved a refusal of a human rights claim (e.g. if Mr Pearse argued that cancellation of his leave would breach his right to family and/or private life, and this claim was rejected). The appeal would lie on the ground that the decision breaches his human rights, and the tribunal would essentially decide the question for itself. I have already set out above the challenge, in cases involving criminality, of succeeding in a claim that cancellation of leave amounts to breach of a person's right to family and/or private life. This applies as much to an appeal, as to any decision by an immigration officer. The prospects of a successful appeal would, in my opinion, be low.

<u>Custodial sentence of less than 12 months/non-custodial sentence</u>

27. If Mr Pearse received a non-custodial sentence or a custodial sentence of less than 12 months, he could still, in theory, be caught by one of the other mandatory grounds for cancellation, or have his leave cancelled under the discretionary grounds, but I consider this to be an unlikely outcome for the reasons below.

*Persistent offender: para 9.4.2(b)*

28. As I understand it, the offences with which Mr Pearse is charged (and the offence to which he has pleaded guilty) arise out of a single set of facts. It is therefore unlikely that he will be considered a persistent offender.

*Offence causing serious harm: para 9.4.2(c)*

29. According to Home Office guidance, this is '*an offence that has caused serious physical or psychological harm to a victim or victims, or that has contributed to a widespread*

---

[11] In this regard, see also the guidance cited at para 57 below.

*problem that causes serious harm to a community or to society in general*'; and '*Where a person has been convicted of one or more violent, drugs-related, racially motivated or sexual offences, they will normally be considered to have been convicted of an offence that has caused serious harm*' (*Grounds for refusal – Criminality* (16 January 2024), page 30[12]).

30. I was advised that in related UK civil litigation, the Republic of Mozambique argued that the conspiracy had the effect of causing the Mozambican economy to collapse. I am told that this argument was later abandoned. Even if it had been pursued, in circumstances where the most significant harm was caused to a third country (not the UK), and in view of the nature of the offence (the focus of the guidance is, notably, on violent, drugs related, racially motivated or sexual offences), there is a good chance that Mr Pearse would not have been taken to have committed an offence causing serious harm.

*Person's presence not conducive to the public good: para 9.3.2*

31. The Home Office guidance, *Suitability: non-conducive grounds for refusal or cancellation of entry clearance or permission*, states that:

'*Non conducive to the public good means that it is undesirable to admit the person to the UK, based on their character, conduct, associations because they pose a threat to UK society. This applies to conduct both in the UK and overseas.*'

The guidance goes on to say that:

'*The test is intentionally broad in nature so that it can be applied proportionately on a case by case basis, depending on the nature of the behaviour and circumstances of the individual. What may be appropriate in one scenario may not be appropriate in another*' (page 4).

32. The guidance sets out the type of factors which will weigh into the decision whether or not a person's presence in the UK will not be conducive to the public good. This includes:

(1) *The nature and seriousness of the behaviour, and its frequency*. I anticipate that the nature and gravity of any sentence will be considered, as well as any sentencing

---

12

https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/965508/grounds_for_refusal_criminality_casework_guidance.pdf

remarks by the sentencing judge. So too will the nature and extent of any impact of the offending behaviour.

(2) *The level of difficulty the UK would face as a result of admitting the person with that behaviour.* A key factor is likely to be the nature and level of the threat the person poses to the UK public.

(3) *Other relevant circumstances pertaining to the individual.* This is likely to include the length of residence in and strength of any ties to the UK.

33. The guidance provides a non-exhaustive list of examples of the type of situations where a person's presence may be non-conducive to the public good, including: the person is a threat to national security, the person has committed serious criminality, a person has been involved or complicit in corruption '*particularly if the corruption is high level or state sanctioned*', or admitting the person to the UK could unfavourably affect the conduct of foreign policy between the UK and elsewhere (a decision which, according to the guidance requires the input/advice of the Foreign, Commonwealth and Development Office) (pages 5-11).

34. It seems unlikely, on the basis of the information before me, that admitting Mr Pearse to the UK would unfavourably affect the conduct of foreign policy between the UK and, say, Mozambique, given Mozambique's dependence on the economies of developed nations such as the UK. As to Mr Pearse's possible complicity in corruption, as I understand it, certain co-conspirators charged alongside Mr Pearse are alleged to have bribed top-ranking members of the Mozambican government. Evidence to this effect was introduced at the trials of two of the co-conspirators (Mr Boustani and Mr Chang). Although my understanding is that there is no evidence which would indicate Mr Pearse's participation in the alleged bribery scheme, it is possible that such bribery (which involved officials at the highest level of the State) could be imputed to him. Even if it is not, and Mr Pearse is not therefore considered a person who has been involved or complicit in corruption, it is possible that the fact of having a conviction may be sufficient to bring Mr Pearse within the scope of this provision. But ultimately, as the guidance makes clear: *'In all cases, you [i.e. the decision maker] must consider what threat the person poses to the UK public. You should balance factors in the individual's favour against negative factors to reach a reasonable and proportionate decision'* (page 5).

35. There are several factors which weigh in Mr Pearse's favour including: the fact that his US conviction was his first and only one, he had no prior (or subsequent) criminal history and is not a persistent offender, and the fact of his co-operation with the US authorities. Moreover, it is not at all obvious that the UK would face any significant difficulty as a result of admitting Mr Pearse because, for example, of the threat he poses to the UK public, or because this would unfavourably affect the conduct of foreign policy between the UK and another state. The length of Mr Pearse's residence, and the strength of his connections to the UK, will also be a significant factor in his favour.

36. Therefore, although it is not possible to exclude the possibility that Mr Pearse's presence in the UK will deemed non-conducive to the public good even in the event of a non-custodial sentence or a custodial sentence of under 12 months, there are, in my view, very good arguments one could make in support of Mr Pearse's case.

*Discretionary grounds for cancellation: para 9.4.5*

37. Para 9.4.5 of the Rules provides that leave *may* be cancelled where person receives a non-custodial sentence, or a custodial sentence of less than 12 months. In other words, there is a *discretion* whether or not to cancel leave; it is not mandatory, as it is where the custodial sentence is 12 months or more. This means there is greater scope for an appeal to the facts and circumstances of a case. Factors relevant to the exercise of discretion will include: the nature and seriousness of the offence (a non-custodial or short custodial sentence would count in Mr Pearse's favour), the difficulty the UK would experience as a result of admitting the person, and the nature and strength of their ties to the UK.

38. In my view, if Mr Pearse were to receive a non-custodial sentence or a custodial sentence of less than 12 months, there would be a very good chance of persuading the immigration officer to exercise discretion in Mr Pearse's favour.

<u>Conclusion</u>

39. A sentence of 12+ months would have very serious consequences and would seriously jeopardise Mr Pearse's status and future in the UK. If Mr Pearse's ILR was cancelled, then he would have to apply for entry clearance/leave to enter from outside the UK for all purposes, including visits. I refer to paras 59-61 below on the obstacles he would

face. Strikingly, a custodial sentence of 12+ months would mean that he would not be able to re-enter the UK even as a visitor, since para 9.4.1(a) of Part 9 of the Immigration Rules provides that '*An application for entry clearance, permission to enter or permission to stay <u>must be refused</u> where the applicant: (a) has been convicted of a criminal offence in the UK or overseas for which they have received a custodial sentence of 12 months or more*' (underlining added). The impact would be much more limited if Mr Pearse received a non-custodial sentence or a custodial sentence of less than 12 months: see para 9.4.4. of the Part 9 of the Immigration Rules, and para 61 below.

## F. Cancellation of ILR and exclusion while a person is outside the UK

40. For completeness, I will also briefly address another mechanism by which Mr Pearse could, in theory, be kept out of the UK.

41. In section E I address the powers to cancel leave when someone arrives in the UK and presents at the border. Leave can also be cancelled while someone is outside the UK. This normally follows an exclusion decision by the SSHD.

42. The SSHD has the power to make an exclusion decision preventing a person from entering the UK on the grounds that their presence in the UK is not conducive to the public good.[13] The decision to exclude must be made *personally* by the SSHD (normally the SSHD or a minister on the SSHD's behalf), usually on the recommendation of officials and the relevant national agency.[14] Where an exclusion decision is made, the SSHD will usually, at the same time, cancel a person's leave in order to give practical effect to the exclusion decision.[15]

---

[13] This is a prerogative (non-statutory) power.

[14] For example, in national security cases the relevant agency will be M15, and in cases involving serious organised crime the relevant agency will be the National Crime Agency. As I understand it, in Mr Pearse's case, the relevant agency will be the Serious Fraud Office.

[15] An exclusion decision does not automatically invalidate a person's leave, which has to be separately cancelled under Article 13(7) of the Immigration (Leave to Enter and Remain) Order 2000. The Court of Appeal has recently confirmed that indefinite leave can be cancelled by the SSHD under Article 13(7): <u>R (C1) v SSHD</u> [2022] EWCA Civ 30.

43. I refer to the Home Office guidance document, *Exclusion from the UK* (9 August 2024)[16] which sets out the type of considerations which will inform the decision whether to exclude a foreign national from the UK on non-conducive grounds.

44. The guidance explains that a person's exclusion on the grounds that it is not conducive to the public good means '*it is undesirable to admit the person to the UK because they pose a threat to UK society. This applies to conduct both in the UK and overseas*' (page 9). It goes on to say that the power to exclude '*is normally used in circumstances involving national security, criminality, international crimes (war crimes, crimes against humanity or genocide), corruption and unacceptable behaviour'* (page 14); '*any exclusion decision must be reasonable, consistent with decisions taken in similar circumstances, and proportionate to the threat they pose to the UK'* (page 21), and *'if the person has existing immigration status in the UK it will be particularly important to address any human rights considerations that may arise*' (page 23).

45. In practice, exclusion decisions tend only to be made in the most serious cases. For example, in relation to criminality, the guidance makes clear:

   *'Where appropriate, individuals with past or present involvement in criminality will normally be refused entry to the UK in line with Part 9 of the Immigration Rules.*

   *Exclusion will not usually be necessary, unless the level of criminality, or the threat posed by the person is so serious that it warrants exclusion. For example, if a notorious or dangerous criminal is a non-visa national, their ability to travel to the UK in the first place may be better prevented by exclusion. Exclusion may also be an option where a foreign national offender has left the UK before it has been possible to conclude the deportation process.'*

46. It seems to me unlikely, in view of the nature of his offending and the guidance, that Mr Pearse will be the subject of an exclusion decision, but the possibility cannot be excluded, particularly in the current political climate (see section A above). A shorter custodial sentence would certainly assist Mr Pearse's cause.

## G. Deportation

47. If Mr Pearse's leave is not cancelled at the border (because, e.g., he is not examined by an immigration officer when he presents at the border ), it is very likely that he would nonetheless be subject to deportation action once he was in the UK.

---

[16]https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/948096/exclusion-v4.0ext.pdf

48. Because his conviction is an overseas conviction, Mr Pearse would not be liable to *automatic* deportation, but the SSHD could nevertheless decide to deport him if she deems his deportation to be "*conducive to the public good*"[17] (any deportation order will automatically invalidate Mr Pearse's ILR[18]). Home Office guidance, *Conducive deportation* (15 March 2024)[19] makes clear that:

*'Government policy is to pursue deportation on grounds of criminality where the person:*

- *has received a custodial sentence of 12 months or more for a single conviction for a single offence in the UK or overseas ...'*

And to similar effect:

*'....a referral must be made to FNO RC [the Home Office department responsible for considering whether to deport a foreign national offender on grounds of criminality] for deportation considerations where a person is already in the UK or is applying to come to the UK and:*

- *the person has, at any time, received a custodial sentence of 12 months or more for a single conviction for a single offence in the UK or overseas ...'*

49. Before a final decision is made, Mr Pearse would have an opportunity to make representations as why he should not be deported. If he relied on his length of residence and family connections in the UK, the SSHD would have to be satisfied that deportation would not breach his right to respect for private or family life.

50. In my view, it would be very difficult to persuade either the SSHD (or the tribunal on any appeal) that deportation would be a breach of Mr Pearse's rights, for essentially the reasons at para 23 above. In short: the right to respect for family and private life is a qualified right which requires a balance to be struck between an individual's interests on the one hand and the public interest on the other. In carrying out the balancing exercise, criminality will be treated as a weighty public interest factor in favour of deportation. Significantly, in a recent case, the Court of Appeal confirmed that the fact that the conviction is an overseas conviction does not mean that a different or lesser weight should be given to the public interest of preventing crime and disorder

---

[17] Immigration Act 1971, s.3(5)(a).
[18] Immigration Act 1971, s.5(1).
[19]
https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1036336/Conducive_Deportation.pdf

(<u>Gosturami v SSHD</u> [2022] EWCA Civ 779, paras 32-36). In my view, the SSHD – and a tribunal on any appeal against the SSHD's decision[20] – is very likely to conclude that this factor outweighs any impact deportation would have on Mr Pearse's family and private life.

51. Once removed, a person who is subject to a deportation order is not permitted to re-enter the UK, even for the purpose of visiting: see paras 9.2.1(c) and 362 of the Immigration Rules, which states:

*'A deportation order requires the subject to leave the United Kingdom and authorises his detention until he is removed. It also prohibits him from re-entering the country for as long as it is in force and invalidates any leave to enter or remain in the United Kingdom given him before the Order is made or while it is in force.'*

## H. Lapsing of ILR

52. Finally, and for completeness, I address the likely implications if Mr Pearse's ILR lapses.

53. If Mr Pearse is absent from the UK for a continuous period of more than 2 years, then his ILR will lapse *automatically* by operation of law.[21]

54. If Mr Pearse's ILR lapses, then he will have to apply for entry clearance/leave to enter from outside the UK for all purposes – whether he wishes to settle in the UK, *or even visit.*

55. The most obvious route for re-entry would an application for entry clearance as a "returning resident." This route is designed especially for those whose ILR has lapsed because of continuous absence from the UK for more than 2 years. (The requirements are set out in para 19 of the Immigration Rules: see Annex A). In short Mr Pearse would have to show that he has *'strong ties to the United Kingdom and intends to make the United Kingdom his permanent home'* which Mr Pearse should have little difficulty in doing.

---

[20] Statistical data on the numbers of appeals allowed by the tribunal on human rights grounds against deportation decisions is telling. It shows that only a relatively small percentage of appeals lodged against deportation decisions are allowed: <u>Statistical note: FNO appeals lodged and allowed on human rights grounds, 2008 to 2021 - GOV.UK (www.gov.uk)</u>

[21] Article 13(4)(a) of the Immigration (Leave to Enter and Remain Order) 2000.

56. However, even if Mr Pearse meets the requirements in para 19, his application *will* be refused if he receives a custodial sentence of 12+ months. Part 9 of the Immigration Rules, as well as setting out the grounds for cancellation of leave, also sets out general grounds for refusing leave where an application is made. The relevant provisions are identical to the grounds for cancellation. Para 9.4.1(a) provides that an application for entry clearance or leave *must* be refused where the applicant has been convicted of a criminal offence in the UK or overseas for which they have received a custodial sentence of 12+ months.

57. The SSHD does have the power to grant leave outside the Immigration Rules, but this is a rare event. This is spelt out in terms in the Home Office guidance document, *Leave outside the Immigration Rules*,[22] and is also consistent with my experience:

    *'A grant of LOTR [leave outside the Rules] should be rare. Discretion should be used sparingly where there are factors that warrant a grant of leave despite the requirements of the Immigration Rules or specific policies having not been met. Factors raised in their application must mean it would not be proportionate to expect the person to remain outside of the UK or to leave the UK.'*

58. On the other hand, para 9.4.3 of the Immigration Rules states that an application for entry clearance or leave *may* be refused where the applicant has been convicted of a criminal offence in the UK or overseas for which they have received a custodial sentence of *less than* 12 months, or a non-custodial sentence. Again, in this scenario, there are very good arguments that could be made in Mr Pearse's case to persuade the SSHD to exercise discretion in Mr Pearse's favour.

59. An alternative to applying for entry clearance as a "returning resident" would be to apply for entry clearance in another capacity, e.g. as a family member of a person who is a British citizen under Appendix FM of the Immigration Rules. Part 9 of the Immigration Rules does not apply to applications made under Appendix FM, which contains its own, and more generous provisions relating to criminality: see Annex A.

---

[22] https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/684049/lotr-compelling-compassionate-grounds-v1.0ext.pdf.

However, there are only limited number of routes under Appendix FM for those wishing to join family members. They include:

(1) Entry clearance as a partner of a person who is a British citizen or has ILR. For these purposes partner means a spouse or civil partner, a fiancé or proposed civil partner, or a person who has been living together with the applicant in a relationship akin to a marriage or civil partnership for at least two years prior to the date of application. The relationship must be a genuine and subsisting one.

(2) Entry clearance as the parent of a child (i.e. person under the age of 18) who is a British citizen or settled in the UK.

There is no route under Appendix FM for entry clearance as the parent of an adult child/children, that is, unless the applicant is dependent on their child/children in the sense of needing long-term personal care to perform everyday tasks.

60. Therefore, in reality, the routes for entry clearance in Appendix FM are unlikely to be available to Mr Pearse on the present state of his personal circumstances, since: (a) he is divorced, and not in a stable/long-term relationship; and (b) his children are adults.

61. The final option would be for Mr Pearse to apply for leave to enter as a visitor. This will not be an attractive or realistic solution for Mr Pearse if his intention is to reside and settle in the UK since: (i) a person applying for a visit visa must satisfy the decision maker that they are a genuine visitor, and will leave at the end of their visit; (ii) visit visas are typically only granted for a short period; and (iii) they are subject to stringent conditions e.g. no work, no study and no recourse to public funds. In any case, and importantly, a custodial sentence of 12+ months would mean that any application for leave to enter as a visitor would be refused (para 9.4.1 of Part 9 of the Immigration Rules). The impact would be much more limited if Mr Pearse received a non-custodial sentence or a custodial sentence of less than 12 months: see para 9.4.4. of the Part 9 of the Immigration Rules, which provides:

*'9.4.4. An application for ... permission to enter under Appendix V: Visitor, or where a person is seeking entry on arrival in the UK for a stay for less than 6 months, must be refused where the applicant:*
*(a) has been convicted of a criminal offence in the UK or overseas for which they have received a custodial sentence of less than 12 months, unless more than 12 months have passed since the end of the custodial sentence; or*

*(b) has been convicted of a criminal offence in the UK or overseas for which they have received a non-custodial sentence, or received an out-of-court disposal that is recorded on their criminal record, unless more than 12 months have passed since the date of conviction.'*

62. It follows that were Mr Pearse's ILR to lapse, a custodial sentence of 12+ months would mean that he would be permanently dis-entitled to return to the UK, whether as a resident or visitor.

## I. Conclusion

63. If Mr Pearse receives a custodial sentence of 12+ months, his ILR will almost certainly be cancelled if and when he presents himself to an immigration officer at the border; alternatively, he would be subject to deportation action and there is a high chance he would be deported. If this happens, Mr Pearse would not be able to return to the UK even as a visitor.

**Hafsah Masood**

Barrister

Landmark Chambers, London

22 September 2024

## RELEVANT PROVISIONS

**Immigration Act 1971**

**3. General provisions for regulation and control**

…

(4) A person's leave to enter or remain in the United Kingdom shall lapse on his going to a country or territory outside the common travel area (whether or not he lands there), unless within the period for which he had leave he returns to the United Kingdom in circumstances in which he is not required to obtain leave to enter; but, if he does so return, his previous leave (and any limitation on it or conditions attached to it) shall continue to apply.

(5) A person who is not a British citizen is liable to deportation from the United Kingdom if—

   (a) the Secretary of State deems his deportation to be conducive to the public good; …

**3A. Further provision as to leave to enter.**

(1)  The Secretary of State may by order make further provision with respect to the giving, refusing or varying of leave to enter the United Kingdom.

(2)  An order under subsection (1) may, in particular, provide for—

   (a)  leave to be given or refused before the person concerned arrives in the United Kingdom;

   (b)  the form or manner in which leave may be given, refused or varied;

   (c)  the imposition of conditions;

   (d)  a person's leave to enter not to lapse on his leaving the common travel area.

…

(10)  An order under this section may—

   (a)  contain such incidental, supplemental, consequential and transitional provision as the Secretary of State considers appropriate; and

   (b)  make different provision for different cases.

…

(12)  An order under this section must be made by statutory instrument.

…

**4. Administration of control.**

(1)  The power under this Act to give or refuse leave to enter the United Kingdom shall be exercised by immigration officers, and the power to give leave to remain in the United Kingdom, or to vary any leave under section 3(3)(a) (whether as regards duration or conditions) or to cancel any leave under section 3C(3A) , shall be exercised by the Secretary of State; ….

(2)  The provisions of Schedule 2 to this Act shall have effect with respect to—

…

(b)  the examination of persons arriving in or leaving the United Kingdom by ship or aircraft …

…

### 5. Procedure for, and further provisions as to, deportation.

(1)Where a person is under section 3(5) or (6) above liable to deportation, then subject to the following provisions of this Act the Secretary of State may make a deportation order against him, that is to say an order requiring him to leave and prohibiting him from entering the United Kingdom; and a deportation order against a person shall invalidate any leave to enter or remain in the United Kingdom given him before the order is made or while it is in force.

…

### Schedule 2

### Para 2A. Examination of persons who arrive with continuing leave

(1)  This paragraph applies to a person who has arrived in the United Kingdom with leave to enter which is in force but which was given to him before his arrival.

(2)  He may be examined by an immigration officer for the purpose of establishing—

(a)  whether there has been such a change in the circumstances of his case, since that leave was given, that it should be cancelled;

(b)  whether that leave was obtained as a result of false information given by him or his failure to disclose material facts; or

(c)  whether there are medical grounds on which that leave should be cancelled.

…

(3)  He may also be examined by an immigration officer for the purpose of determining whether it would be conductive to the public good for that leave to be cancelled.

…

(5)  A person examined under this paragraph may be required by the officer or inspector to submit to further examination.

...

(7)  An immigration officer examining a person under this paragraph may by notice suspend his leave to enter until the examination is completed.

(8)  An immigration officer may, on the completion of any examination of a person under this paragraph, cancel his leave to enter.

**Immigration (Leave to Enter and Remain Order) 2000**

Now, therefore, the Secretary of State, in exercise of the powers conferred upon him by sections 3A(1), (2), (3), (4), (6) and (10) and 3B(2)(a) and (c) and (3)(a) of the Immigration Act 1971, hereby makes the following Order:

…

**Part IV Leave which does not lapse on travel outside the common travel area**

**13.**

(1)   In this Part "leave" means –

    (a)  leave to enter the United Kingdom (including leave to enter conferred by means of an entry clearance under article 2); and

    (b)  leave to remain in the United Kingdom.

(2)  Subject to paragraph (3), where a person has leave which is in force and which was:

    (a)   conferred by means of an entry clearance … under article 2; or

    (b)  given by an immigration officer or the Secretary of State for a period exceeding six months,

    such leave shall not lapse on his going to a country or territory outside the common travel area.

(3)  Paragraph (2) shall not apply:

    (a)  where a limited leave has been varied by the Secretary of State; and

    (b)  following the variation the period of leave remaining is six months or less.

(4)  Leave which does not lapse under paragraph (2) shall remain in force either indefinitely (if it is unlimited) or until the date on which it would otherwise have expired (if limited), but–

…

    (a) …where the holder has stayed outside the United Kingdom and Islands for a continuous period of more than two years, the leave (where the leave is unlimited) or any leave then remaining (where the leave is limited) shall thereupon lapse;

…

(5)  For the purposes of paragraphs 2 and 2A of Schedule 2 to the Act[23] (examination by immigration officers, and medical examination), leave to remain which remains in force under this article shall be treated, upon the holder's arrival in the United Kingdom, as leave to enter which has been granted to the holder before his arrival.

(6)  Without prejudice to the provisions of section 4(1) of the Act, where the holder of leave which remains in force under this article is outside the United Kingdom, the Secretary of State may vary that leave (including any conditions to which it is subject) in such form and manner as permitted by the Act or this Order for the giving of leave to enter.

(7)  Where a person is outside the United Kingdom and has leave which is in force by virtue of this article, that leave may be cancelled:

---

[23] All references to "the Act" are to the Immigration Act 1971.

(a) in the case of leave to enter, by an immigration officer; or

(b) in the case of leave to remain, by the Secretary of State.

(8)  In order to determine whether or not to vary (and, if so, in what manner) or cancel leave which remains in force under this article and which is held by a person who is outside the United Kingdom, an immigration officer or, as the case may be, the Secretary of State may seek such information, and the production of such documents or copy documents, as an immigration officer would be entitled to obtain in an examination under paragraph 2 or 2A of Schedule 2 to the Act and may also require the holder of the leave to supply an up to date medical report.

(9)  Failure to supply any information, documents, copy documents or medical report requested by an immigration officer or, as the case may be, the Secretary of State under this article shall be a ground, in itself, for cancellation of leave.

(10)  Section 3(4) of the Act (lapsing of leave upon travelling outside the common travel area) shall have effect subject to this article.


**Immigration Rules**

**Part 1: Returning Residents**

18. A person may resume their residence in the UK provided the Immigration Officer is satisfied that the person concerned:

> (i) had indefinite leave to enter or remain in the United Kingdom when he last left; and

> (ii) has not been away from the United Kingdom for more than 2 years; and

> (iii) did not receive assistance from public funds towards the cost of leaving the United Kingdom; and

> (iv) now seeks admission for the purpose of settlement.

18A. Those who qualify to resume their residence in accordance with paragraph 18 do not need a visa to enter the UK.

19. A person who does not benefit from the preceding paragraph by reason only of having been absent from the United Kingdom for more than two consecutive years, must have applied for, and been granted indefinite leave to enter by way of entry clearance if, he can demonstrate he has strong ties to the United Kingdom and intends to make the United Kingdom his permanent home.

…

20. The leave of a person whose stay in the United Kingdom is subject to a time limit lapses on his going to a country or territory outside the common travel area if the leave was given for a period of six months or less or conferred by a visit visa. In other cases, leave lapses on the holder remaining outside the United Kingdom for a continuous period of more than two years. A person whose leave has lapsed and who returns after a temporary absence abroad within the period of this earlier leave has no claim to admission as a returning resident. His application to re-enter the United Kingdom should be considered in the light of all the relevant circumstances. The same time limit and any conditions attached will normally be reimposed if he meets the requirements of these Rules, unless he is seeking admission in a different capacity from the one in which he was last given leave to enter or remain.

**Part 9: grounds for refusal**

Suitability requirements apply to all routes and must be met in addition to validity and eligibility requirements.

Where this Part applies a person will not meet the suitability requirements if they fall for refusal under this Part.

A person may also have their entry clearance or permission cancelled on suitability grounds.

More than one grounds for refusal or cancellation may apply, for example, the presence of a foreign criminal in the UK may not be conducive to the public good.

The Immigration Act 1971, section 76 of the Nationality, Immigration and Asylum Act 2002 (revocation of indefinite leave), the Immigration (Leave to Enter and Remain) Order 2000 and Schedule 2 of the Immigration Act 1971 set out the powers to cancel entry clearance or permission. These rules set out how those powers are to be exercised.

Decisions on suitability are either mandatory (must) or discretionary (may) and must be compatible with the UK obligations under the Refugee Convention and the European Convention on Human Rights, which are mainly provided for under other provisions in these Rules.

Some routes have their own, or additional, suitability requirements.

### Section 1: Application of this part

9.1.1. Part 9 does not apply to the following:

(a) Appendix FM, except paragraphs 9.2.2, 9.3.2, … applies to permission to stay.

### Section 2: Grounds for refusal, or cancellation, of entry clearance, permission to enter and permission to stay

*Exclusion or deportation order grounds*

9.2.1. An application for entry clearance, permission to enter or permission to stay must be refused where:

> (a) the Secretary of State has personally directed that the applicant be excluded from the UK; or

> (b) the applicant is the subject of an exclusion order; or.

> (c) the applicant is the subject of a deportation order, or a decision to make a deportation order.

9.2.2. Entry clearance or permission held by a person must be cancelled where the Secretary of State has personally directed that the person be excluded from the UK.

*Non-conducive grounds*

9.3.1. An application for entry clearance, permission to enter or permission to stay must be refused where the applicant's presence in the UK is not conducive to the public good because of their conduct, character, associations or other reasons (including convictions which do not fall within the criminality grounds).

9.3.2. Entry clearance or permission held by a person must be cancelled where the person's presence in the UK is not conducive to the public good.

*Criminality grounds*

9.4.1. An application for entry clearance, permission to enter or permission to stay <u>must be refused</u> where the applicant:

> (a) has been convicted of a criminal offence in the UK or overseas for which they have received a custodial sentence of 12 months or more; or

> (b) is a persistent offender who shows a particular disregard for the law; or

> (c) has committed a criminal offence, or offences, which caused serious harm.

9.4.2. Entry clearance or permission held by a person must be cancelled where the person:

> (a) has been convicted of a criminal offence in the UK or overseas for which they have received a custodial sentence of 12 months or more; or

> (b) is a persistent offender who shows a particular disregard for the law; or

> (c) has committed a criminal offence, or offences, which caused serious harm.

9.4.3. An application for entry clearance, permission to enter or permission to stay may be refused (where paragraph 9.4.2. and 9.4.4. do not apply) where the applicant:

> (a) has been convicted of a criminal offence in the UK or overseas for which they have received a custodial sentence of less than 12 months; or

> (b) has been convicted of a criminal offence in the UK or overseas for which they have received a non-custodial sentence, or received an out-of-court disposal that is recorded on their criminal record.

9.4.4. An application for entry clearance or permission to enter under Appendix V: Visitor [i.e. as a visitor], or where a person is seeking entry on arrival in the UK for a stay for less than 6 months, must be refused where the applicant:

> (a) has been convicted of a criminal offence in the UK or overseas for which they have received a custodial sentence of less than 12 months, unless more than 12 months have passed since the end of the custodial sentence; or

> (b) has been convicted of a criminal offence in the UK or overseas for which they have received a non-custodial sentence, or received an out-of-court disposal that is recorded on their criminal record, unless more than 12 months have passed since the date of conviction.

9.4.5. Entry clearance or permission held by a person may be cancelled … where the person:

> (a) has been convicted of a criminal offence in the UK or overseas for which they have received a custodial sentence of less than 12 months; or

> (b) has been convicted of a criminal offence in the UK or overseas for which they have received a non-custodial sentence, or received an out-of-court disposal that is recorded on their criminal record.

**Appendix FM: Family Members**

*Section S-EC: Suitability-entry clearance*

S-EC.1.1. The applicant will be refused entry clearance on grounds of suitability if any of paragraphs S-EC.1.2. to 1.9. apply.

S-EC.1.2. The Secretary of State has personally directed that the exclusion of the applicant from the UK is conducive to the public good.

S-EC.1.3. The applicant is currently the subject of a deportation order.

S-EC.1.4. The exclusion of the applicant from the UK is conducive to the public good because they have:

(a) been convicted of an offence for which they have been sentenced to a period of imprisonment of at least 4 years; or

(b) been convicted of an offence for which they have been sentenced to a period of imprisonment of at least 12 months but less than 4 years, unless a period of 10 years has passed since the end of the sentence; or

(c) been convicted of an offence for which they have been sentenced to a period of imprisonment of less than 12 months, unless a period of 5 years has passed since the end of the sentence.

S-EC.1.5. The exclusion of the applicant from the UK is conducive to the public good because, for example, the applicant's conduct (including convictions which do not fall within paragraph S-EC.1.4.), character, associations, or other reasons, make it undesirable to grant them entry clearance.

…

S-EC.2.1. The applicant will normally be refused on grounds of suitability if any of paragraphs S-EC.2.2. to 2.5. apply

S-EC.2.5. The exclusion of the applicant from the UK is conducive to the public good because:

(a) within the 12 months prior to the date on which the application is decided, the person has been convicted of or admitted an offence for which they received a non-custodial sentence or other out of court disposal that is recorded on their criminal record; or

(b) in the view of the Secretary of State:

(i) the person's offending has caused serious harm; or

(ii) the person is a persistent offender who shows a particular disregard for the law.

**ANNEX B**

**CURRICULAM VITAE**

# CURRICULAM VITAE

## MS HAFSAH MASOOD

Year of call: 2006

## EDUCATION

2005-2006    Bar Vocational Course (Very Competent), Inns of Court School of Law

2004-2005    LLM Public International Law (Distinction), London School of Economics

2000-2004    BA (Hons) Law (Upper Second), University of Oxford

## WORK HISTORY

2019-Present    Tenant, Landmark Chambers, 180 Fleet Street, London

2010-2019    Tenant, 3 Hare Court, Temple, London

2009-2010    Pupillage, 3 Hare Court, Temple, London

2008-2009    Judicial Assistant, Court of Appeal

2006-2008    Research Assistant, The Law Commission

## APPOINTMENTS AND MEMBERSHIPS

Attorney General's A Panel of Junior Counsel to the Crown (Sep 2023-Present)

Attorney General's B Panel of Junior Counsel to the Crown (Sep 2019-Aug 2023)

Attorney General's C Panel of Junior Counsel to the Crown (Mar 2015-Aug 2019)

ILPA (Immigration Law Practitioners' Association)

AIJA (International Association of Young Lawyers)

CLA (Commonwealth Lawyers' Association)

## PRACTICE AREAS

Main areas of practice:

a. <u>Public law</u>. I have particular expertise in immigration and asylum, and civil liberties and human rights. I act for both individuals and the state, and regularly appear in the Court of Appeal, High Court and tribunals.

b. <u>Employment and discrimination</u>. My practice encompasses all aspects of employment law. I have particular interest and expertise in discrimination law.

b. <u>International work</u>. This includes: (i) appellate work in the Judicial Committee of the Privy Council, acting in appeals covering a range of areas, including constitutional law, judicial review, employment, and crime; and (ii) work, mainly in an advisory capacity, in a number of Commonwealth jurisdictions.

E. hmasood@landmarkchambers.co.uk

T. +44 (0)20 7430 1221